**PINO v. NICOLLS (two cases).**
Nos. 4832, 4833.

United States Court of Appeals, First Circuit.

Aug. 2, 1954.

Writ of Certiorari Granted
Nov. 8, 1954.

See 75 S.Ct. 106.

Reuben Goodman, Boston, Mass. (Paul T. Smith and Manuel Katz, Boston, Mass., on the brief), for appellant.

Jerome Medalie, Asst. U. S. Atty., Boston, Mass. (Anthony Julian, U. S. Atty., Boston, Mass., on the brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Anthony Pino, an alien who has been ordered to be deported pursuant to § 241(a) (4) of the Immigration and Nationality Act, 66 Stat. 204, 8 U.S.C.A.

§ 1251(a) (4), filed in the district court a petition for a writ of habeas corpus. The district court issued the writ, held a hearing thereon, and on February 1, 1954, entered an order discharging the writ and dismissing the petition, with an accompanying opinion coming to the conclusion, as had the Board of Immigration Appeals, that the warrant of deportation had been lawfully issued by the Special Inquiry Officer. 119 F.Supp. 122. Pino's appeal from this order of the district court is docketed in this court as No. 4832. Also, Pino filed in the district court a motion to be enlarged on bail pending appeal. Upon denial of this motion on February 2, 1954, Pino took an appeal (No. 4833) from the order of denial. On March 11, 1954, this court denied an interlocutory motion by Pino asking us to enlarge him on bail pending appeal. 211 F.2d 393. Subsequently, by administrative action of the Attorney General, Pino was admitted to bail pending these appellate proceedings, with the result that the appeal in No. 4833 has become moot and will be dismissed on that ground. However, we still have before us the main appeal in No. 4832, involving the validity of the warrant of deportation.

Appellant was born in Italy, and was brought to this country in 1908 when he was one year old. He has maintained a residence here since that time, but has not become an American citizen.

It appears from the record that a warrant of arrest was issued against Pino on April 20, 1938, in an earlier attempt to deport him under § 19 of the Immigration Act of 1917, 39 Stat. 889 in that, after passage of that Act, the alien had, as alleged, been sentenced more than once to imprisonment for a term of one year or more "because of conviction in this country of any crime involving moral turpitude, committed at any time after entry". This deportation proceeding was based upon (1) a conviction in Massachusetts by verdict of a petit jury on March 20, 1928, for carnal abuse of a female child, for which offense Pino was sentenced on March 29, 1928, to a term of five years and a day in the Massachusetts Reformatory in Concord, and (2) a conviction in Massachusetts on January 6, 1938, following a plea of guilty to the offense of breaking and entering a building in the daytime with intent to commit a felony therein, for which offense he was sentenced to a term of from three to four years in the Massachusetts State Prison, and (3) a conviction in Massachusetts on January 6, 1938, following a plea of guilty to the offense of illegal possession of burglary tools, for which offense he was sentenced to a term of from three to four years in Massachusetts State Prison, to be served consecutively after expiration of the sentence for breaking and entering. For some undisclosed reason, the deportation proceeding dragged on, until finally, on September 6, 1949, Pino obtained from the Acting Governor of Massachusetts and Council a full pardon for each of the two offenses listed in (2) and (3) above. Under § 19 of the Immigration Act of 1917, those pardons cut the ground from under the earlier deportation proceeding; and on October 26, 1950, an Assistant Commissioner of the Immigration and Naturalization Service ordered the cancellation of the warrant of arrest dated April 20, 1938.

Subsequently, on June 27, 1952, Congress passed the Immigration and Nationality Act, 66 Stat. 163, 8 U.S.C.A. § 1101 et seq. making important changes in the requirements for deportation of aliens.

The presently pending deportation proceeding was initiated by a warrant of arrest issued January 5, 1953, and served a few days thereafter. Deportation was sought pursuant to the provisions of § 241(a)(4) of the Immigration and Nationality Act, reading as follows, 66 Stat. 204:

"Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—* * *

"(4) is convicted of a crime involving moral turpitude committed

within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more, or who at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial;  *  *  *."

The proceeding was based upon two distinct convictions for crimes involving moral turpitude, *viz.*, (1) the aforementioned conviction in Massachusetts by verdict of a petit jury on March 20, 1928, for carnal abuse of a female child, for which offense Pino was sentenced on March 29, 1928, to a term of five years and a day in the Massachusetts Reformatory, and (2) a conviction of petty larceny, contrary to Mass.G.L. c. 266, § 30, upon a finding of guilty on January 4, 1949, after trial in the Third District Court of Eastern Middlesex, for which offense the court originally sentenced Pino to a term of one year in the House of Correction. The execution of this sentence was subsequently suspended by the court, and ultimately the sentence was revoked and the case placed on file, without, however, revoking the finding of guilty. Since the sentence of imprisonment was revoked and Pino served no time for this offense, it could not be used as a basis for deportation in the earlier proceeding under the Immigration Act of 1917. See United States ex rel. Robinson v. Day, 2 Cir., 1931, 51 F.2d 1022. But, as above appears, § 241(a)(4) of the 1952 Act provides for the deportation of aliens convicted, after entry, of two crimes involving moral turpitude "regardless of whether confined therefor".

■ There is no doubt that the requirements of § 241(a)(4) have been satisfied so far as concerns the offense of carnal abuse of a female child. This offense is defined in Mass.G.L. c. 265, § 23, under the caption "Rape of child." There was introduced in the present proceeding a certified copy of a record in the Superior Court for Suffolk County, Mass., from which the following appears: On January 9, 1928, the grand jury handed down an indictment charging that Pino on November 17, 1927, made an assault upon a certain female child under the age of sixteen years with the intent unlawfully and carnally to know and abuse her; and did then and there unlawfully and carnally know and abuse her. Pino pleaded not guilty. After trial, a petit jury returned a verdict of guilty on March 20, 1928. On March 29, 1928, the Superior Court imposed upon Pino a sentence of commitment to the Massachusetts Reformatory at Concord for the term of five years and one day. Though appellant makes some half-hearted contention to the contrary, it cannot now be questioned that this offense properly belongs in the category of crimes involving moral turpitude. Bendel v. Nagle, 9 Cir., 1927, 17 F.2d 719, 57 A.L.R. 1129; Ng Sui Wing v. United States, 7 Cir., 1931, 46 F.2d 755. See also Commonwealth v. Roosnell, 1886, 143 Mass. 32, 8 N.E. 747; Commonwealth v. Murphy, 1895, 165 Mass. 66, 42 N.E. 504, 30 L.R.A. 734; Commonwealth v. Hackett, 1898, 170 Mass. 194, 48 N.E. 1087.

That brings us to one of the more seriously contested points in the case, whether the record in the Third District Court of Eastern Middlesex, duly authenticated by the testimony of the First Assistant Clerk of that court, compels the conclusion, as a matter of law, that within the meaning of § 241(a)(4) of the Immigration and Nationality Act Pino stands "convicted" in that court of a "crime involving moral turpitude". From this record we derive the following: On December 8, 1948, a complaint was filed in the Third District Court of Eastern Middlesex charging that Pino did steal twelve golf balls of value less than one hundred dollars, the property of R. W. Shattuck Co., Inc. Pino pleaded not guilty. On December 23, 1948, the District Court, sitting without a jury of course, found the defendant guilty and forthwith imposed a sentence of imprisonment for one year in the House of Cor-

rection. On December 27, 1948, Pino took an appeal to the Superior Court, which appeal, if it had been persisted in, would have entitled Pino to a trial *de novo* before a jury in the Superior Court. However, on December 28, 1948, this appeal was withdrawn by leave of court. On the same day a motion for a new trial was filed in the District Court and allowed by that court, which thereupon revoked its previous finding of guilty and continued the case for retrial. On January 4, 1949, after a new trial, the District Court again found defendant guilty and again imposed a sentence of one year's imprisonment in the House of Correction. On January 10, 1949, Pino appealed from this second judgment of conviction. But on January 28, 1949, this second appeal was withdrawn by Pino by leave of court and on the same day the District Court either expressly or impliedly reimposed the original sentence of one year's imprisonment in the House of Correction, and suspended the execution of the same to January 30, 1950. Though the formal entries do not so state, we gather from the testimony of the Assistant Clerk that this was automatically equivalent to putting the defendant on probation for one year beginning January 28, 1949. There was a further entry made on that date, "appeal waived". Apparently the probation report after Pino had served out his probationary period was satisfactory to the court, for as of January 30, 1950, appears the entry "Sentence revoked. On file." The Assistant Clerk testified that this was the usual procedure in the court, in that "where a man is given a suspended sentence and put on probation, he serves out his probation and the case is then filed".

Thus it appears that twice, after the District Court found Pino guilty and imposed sentence upon him, Pino had the opportunity to have a trial *de novo* in the Superior Court, but in each instance he withdrew his appeal by leave of court. If Pino could have appealed again to the Superior Court when the reimposed or reinstated sentence of imprisonment was suspended by the District Court on January 28, 1949, and the defendant put on probation, such appeal seems to have been expressly waived. At any rate, Pino's acquiescence in the suspended sentence and acceptance of probation precluded a subsequent appeal. Mariano v. Judge of District Court, 1922, 243 Mass. 90, 137 N.E. 369; Renado v. Lummus, 1910, 205 Mass. 155, 91 N.E. 144. It is clear, also, that at that point Pino stood "convicted" in the District Court under any suggested definition of the word; and under § 241(a)(4) of the Immigration and Nationality Act, it is of no consequence that he was not actually imprisoned for the offense.

But appellant asserts that this record of conviction was in effect obliterated by the entry on January 30, 1950: "Sentence revoked. On file." In Marks v. Wentworth, 1908, 199 Mass. 44, 45, 85 N.E. 81, the Supreme Judicial Court discussed this procedure of placing a case on file:

"It has long been the practice in this Commonwealth for a court, with the consent of the defendant, after a verdict or plea of guilty in a criminal case, when for good cause it seems best not to impose sentence immediately, to place the case on file. This practice has been recognized by statute and approved by this court. The effect of it is fully stated in Commonwealth v. Dowdican's Bail, 115 Mass. 133. See, also, Commonwealth v. Foster, 122 Mass. 317, 323; Commonwealth v. Maloney, 145 Mass. 205, 13 N.E. 482. The case then stands on the records of the court, and although usually no further proceedings are had in it, it may at any time be called up and sentence may be imposed, or some other final disposition may be made of it. But the case cannot properly be placed on file without the consent of the defendant. He has a right to have it finally disposed of, without unreasonable delay, so that he will not be liable for an indefinite period to be brought into the court and subjected

to punishment. Although this practice formerly prevailed only in the higher courts, it was extended by statute to the police, district and municipal courts. Rev.Laws, c. 160, § 39; St.1893, p. 1123, c. 396, § 54. But when the statute gave to these courts authority to place complaints on file, it did not authorize such a disposition of a case against the objection of the defendant."

What was the District Court to do on January 30, 1950? The period had expired within which the execution of the sentence of imprisonment was suspended by prior order. Unless something was done about it, the sentence, no longer suspended, was subject to be carried into execution. If at that date the District Court was finally satisfied that the object of the one-year's probation had been accomplished, in such a way as not to require imprisonment of the defendant either for his own reformation or in the interests of the public, the logical thing to have done would have been to revoke the prison sentence and to dismiss the case, which final disposition the District Court had power to make. See Marks v. Wentworth, supra. But such action would not have been equivalent to wiping out the record of conviction in the District Court. The finding of guilty was unrevoked, and the order of dismissal in the circumstances would have been no more than a judicial determination that the ends of justice had been served by the period of probationary discipline and surveillance—"an authorized mode of mild and ambulatory punishment"— which had been imposed for the offense of which the defendant had been found guilty. See Korematsu v. United States, 1943, 319 U.S. 432, 435, 63 S.Ct. 1124, 87 L.Ed. 1497.

But when the District Court on January 30, 1950, revoked the sentence, the court chose to place the case on file instead of finally disposing of it by dismissing it. As indicated in Marks v. Wentworth, supra, the District Court could properly have put the case on file only with the consent of the defendant.

Apparently the defendant acquiesced in this action of the District Court. At least, there is nothing in the record to suggest dissent. After his apparent acquiescence for over four years, we do not believe that Pino could successfully invoke in the Superior Court the extraordinary remedy of a writ of mandamus to compel the District Court to impose sentence or otherwise make a final disposition of the case. Such a remedy was obtained in Marks v. Wentworth, supra, but by a defendant who had strenuously registered his dissent at the very time the court, after a finding of guilty, placed the case on file.

The case thus being in the on-file status, technically the district court postponed indefinitely a determination whether the ends of justice required the imposition of a prison sentence for the offense of which Pino had been found guilty. Theoretically, the case could later be taken from the files and a prison sentence imposed. In the most unlikely event that this should happen, Pino asserts that he would be entitled to appeal from the sentence so imposed, and thus obtain a trial *de novo* before a jury in the Superior Court, which trial might result in an ultimate acquittal of the offense of petty larceny. Therefore Pino contends that the present posture of the case, in its on-file status, is so lacking in finality that on the record in the District Court it cannot be said that Pino stands "convicted" in the Massachusetts courts of the crime of petty larceny. Whether Pino could appeal from such a sentence newly imposed after the case was taken from the files we do not know for sure. For present purposes, we shall assume that he could, for we think it makes no difference anyway.

In these deportation cases, where a state crime is involved, it is commonly said that the federal courts are governed by the laws of the state in determining whether the alien was "convicted" of such crime. United States ex rel. Freislinger, on Behalf of Kappel v. Smith, 7 Cir., 1930, 41 F.2d 707, 708. In a certain limited sense, this statement is accurate.

We have to look to the law and procedure of the state to interpret what happened in the state courts. For instance, if a finding of guilty has been made by a court without a jury, the law of the state determines whether the court is authorized to make such finding of fact. But examination of the Massachusetts decisions on the meaning of the word "convicted" shows that the word may be given a certain meaning in one context, and something quite different in another. Thus in the leading case of Commonwealth v. Lockwood, 1872, 109 Mass. 323, the governor and council had issued a pardon to a person after he had been found guilty by verdict of the jury and before sentence had been imposed and while exceptions allowed by the trial judge were pending in the Supreme Judicial Court. It was held that the pardon was effective notwithstanding a provision in the constitution of the state that "no charter of pardon, granted by the governor, with advice of the council, *before conviction,* shall avail the party pleading the same". (Italics added.) The court pointed out that the ordinary legal meaning of "conviction" when used to designate a particular stage of a criminal prosecution triable by a jury "is the confession of the accused in open court, or the verdict returned against him by the jury, which ascertains and publishes the fact of his guilt; while 'judgment' or 'sentence' is the appropriate word to denote the action of the court before which the trial is had, declaring the consequences to the convict of the fact thus ascertained." 109 Mass. at page 325. In Munkley v. Hoyt, 1901, 179 Mass. 108, 60 N.E. 413, the court was dealing with a statutory provision authorizing the Board of Registration in Pharmacy after hearing to suspend or revoke the registration of a registered pharmacist, "but the license or certificate of registration of a registered pharmacist shall not be suspended or revoked for a cause punishable by law until after *conviction* by a court of competent jurisdiction." (Italics added.) In this case a registered pharmacist had pleaded guilty to a complaint in the Superior Court charging him with unlawful sale of intoxicating liquor and thereupon that court had ordered the complaint placed on file. It was held that this was a "conviction" within the meaning of the foregoing statutory provision. On the other hand, in Commonwealth v. Gorham, 1868, 99 Mass. 420, applying a statute providing that criminal "conviction" of a witness might be shown to affect his credibility, the Supreme Judicial Court held that in this context the legislature meant to require not merely a verdict of guilty but a final judgment of the court determining guilt. See also Forcier v. Hopkins, 1953, 329 Mass. 668, 110 N.E.2d 126. And in Commonwealth v. Kiley, 1889, 150 Mass. 325, 23 N.E. 55, it was held that a statute providing that " 'the conviction, by a court of competent jurisdiction' " of a liquor licensee for violating any of the provisions of the laws relating to intoxicating liquors " 'shall, of itself, make the license of said person void' ", implied a final judgment of the court.

■ It is obvious that the Massachusetts courts have never been called upon to interpret the meaning of the word "convicted" in the context of a deportation case, where the word is used in an Act of Congress setting forth the requirements for deportability of aliens. In this context, in the interest of a uniform application of the federal statute, the meaning of the word "convicted" is a federal question to be determined upon due consideration of the policy which § 241(a)(4) of the Immigration and Nationality Act was designed to serve.

The object, of course, is to get rid of aliens with socially undesirable criminal traits. Once in a while, an innocent man may be convicted. But Congress did not impose upon the Attorney General the impossible administrative burden of ascertaining *de novo* whether the alien in fact was guilty of the offenses of which he had been legally convicted. If there stand against the alien two or more records of conviction in courts of competent jurisdiction of crimes involving

moral turpitude, the assumption of the Act is that the alien was guilty of the offenses in question and that his social undesirability has thus been sufficiently established for purposes of deportation.

But since legal determination of guilt is made the statutory test of deportability, we should seek an interpretation of the word "convicted" in § 241(a)(4) as will ensure that this legal determination has been made with reasonable certainty and finality. Perhaps a formal plea of guilty to a complaint or indictment, accepted by the court, is a conviction in this sense, even before the court takes any action on the matter of sentence. See Kercheval v. United States, 1927, 274 U.S. 220, 223, 47 S.Ct. 582, 71 L.Ed. 1009; United States v. Scarlata, 3 Cir., 214 F.2d 807. We do not have that problem here, for Pino pleaded not guilty to the charge of petty larceny. The government contends that upon a plea of not guilty, the statutory requirement of being "convicted" is satisfied, without more, when a verdict of guilty is returned by the jury, or a finding of guilty is made by the court, as the case may be. We are not prepared to assent to this proposition. A verdict or finding of guilty is usually followed by a motion for a new trial which, as we know, and as was so in Pino's petty larceny case, frequently results in the award of a new trial. So, too, appeals from conviction in the trial court often result in the award of a new trial. Judicial action on the motion for a new trial made immediately after verdict or finding of guilt, and judicial action in the normal routine appellate review provided by law, are part of the ordinary processes of re-examination, the outcome of which perhaps ought to be awaited before it can be said, with sufficient certainty and definiteness, that the state has "convicted" the alien of crime.

However, if the government must stay its action of deportation to await the outcome of these routine processes of judicial re-examination, that does not mean that the government has to wait forever, until every remote possibility of ultimate upset of a conviction has been extinguished. It is a possibility that, long after conviction in the ordinary sense, new evidence may be discovered, and the case reopened on that ground and a new trial granted. In Massachusetts, many years after verdict of guilty, imposition of sentence, and even affirmance on appeal, it may be possible to obtain the setting aside of a conviction on the ground that it was procured in derogation of the accused's fundamental constitutional rights, by the procedure of a writ of error issued out of the Supreme Judicial Court. See Lindsey v. Commonwealth, Mass., 1954, 116 N.E.2d 691; McGarty v. Commonwealth, 1950, 326 Mass. 413, 95 N.E.2d 158; Allen v. Commonwealth, 1949, 324 Mass. 558, 87 N.E. 2d 192. In other states, a long-standing conviction may, in subsequent habeas corpus proceedings, be judicially determined to have been illegal. The mere possibility of such ultimate upsets does not defeat deportation of the convicted alien; though of course if, prior to deportation, he has succeeded in one of these ways in upsetting his conviction, it can no longer serve as a basis for deportation.

■ With these general considerations in mind, we are satisfied that on the record in the Third Judicial Court of Eastern Middlesex, as above recited, Pino stands "convicted" of the crime of petty larceny within the meaning of § 241(a)(4). Pino was tried, found guilty, and sentenced to imprisonment. Upon a routine motion for a new trial, the District Court vacated its finding of guilt, tried him a second time, again found him guilty and reimposed the sentence of imprisonment. Twice Pino appealed to the Superior Court, but in each instance he withdrew his appeal and voluntarily relinquished the opportunity to test his innocence in the appellate courts of the Commonwealth. Execution of the sentence was suspended for a year, during which time we gather that Pino was on probation. At the end of the year the sentence was revoked and the case placed on file in the District Court. Placing the

case on file was not equivalent to a revocation of the judicial determination of Pino's guilt, which for deportation purposes is the principal measure of his lack of social desirability. The action of placing the case on file only meant that for the time being the District Court was satisfied that the interests of justice did not require the imposition of a prison term upon Pino for the offense of which he stood convicted; but, as above pointed out, it is of no consequence under the wording of § 241(a)(4) that Pino did not actually serve time for the offense. Though theoretically it may be possible for the District Court at some time in the future to take the case from the files and make a final disposition of it, if we take account of the ordinary modes of procedure in the local courts it must be concluded that there is every probability that, once a case is placed on file, it will remain in that status undisturbed and probably forgotten. This petty larceny case against Pino has already remained on file four and a half years. Pino cannot as a matter of right have it removed from that on-file status so as to have the outstanding record of conviction obliterated.

In fact, after the present deportation proceeding was commenced, Pino filed in the District Court on February 4, 1953, a motion for a new trial on the ground of newly discovered evidence. This motion was denied by the District Court on December 23, 1953, whether on the merits or on the ground that the motion was untimely does not appear. Of course, if the District Court, pending the deportation proceedings, had granted this long-delayed motion for a new trial and had vacated the finding of guilt, then the prior conviction of this particular crime could no longer have served as a basis for deportation. And while this motion for a new trial was pending undisposed-of by the District Court, with the possibility that it might eventuate in the ultimate establishment of Pino's innocence, Pino might have applied to the District Director for a stay of deportation to await the outcome, but the granting of such a stay would have been a matter of administrative discretion. See 8 C.F.R. (1952 Rev.) § 243.3(b).

■ Appellant has made no contention in this court that the crime of larceny is not properly to be classified in the general category of crimes involving moral turpitude. It is well-settled that, in ordinary acceptation, the crime of larceny, whether grand or petty, is a crime involving moral turpitude. Blumen v. Haff, 9 Cir., 1935, 78 F.2d 833; Tillinghast v. Edmead, 1 Cir., 1929, 31 F.2d 81. We shall say a word about that. There is some force in the comment by Judge Anderson, dissenting, in Tillinghast v. Edmead, supra, 31 F.2d at page 84: "It seems to me monstrous to hold that a mother stealing a bottle of milk for her hungry child, or a foolish college student stealing a sign or a turkey, should be tainted as guilty of a crime of moral turpitude." Indeed, it is possible to conceive of circumstances under which almost any crime might be committed from the purest of motives, motives, however, which the law does not accept as a defense. But here again, with considerations of administrative workability in mind, Congress has painted with a broad brush. If the crime in its general nature is one which in common usage would be classified as a crime involving moral turpitude, neither the administrative officials in a deportation proceeding nor the courts on review of administrative action are under the oppressive burden of taking and considering evidence of the circumstances of a particular offense so as to determine whether there were extenuating factors which might relieve the offender of the stigma of moral obliquity. See United States ex rel. Robinson v. Day, 2 Cir., 1931, 51 F.2d 1022. Congress did not overlook the possibility of extenuating circumstances in the particular case, for it prescribed in § 241(b) of the Immigration and Nationality Act of 1952 that the provisions of § 241(a)(4) respecting the deportation of an alien convicted of a crime or crimes "shall not apply (1) in the case of any alien who has subsequent to such conviction been granted a full

and unconditional pardon by the President of the United States or by the Governor of any of the several States, or (2) if the court sentencing such alien for such crime shall make, at the time of first imposing judgment or passing sentence, or within thirty days thereafter, a recommendation to the Attorney General that such alien not be deported * * *." 66 Stat. 208. A similar provision was found in § 19 of the Immigration Act of 1917, 39 Stat. 889-90.

While appellant relies primarily upon the argument that, on the record in the Third District Court of Eastern Middlesex, he does not stand "convicted" of the crime of larceny, he also urges that he is not deportable under § 241(a)(4) of the Immigration and Nationality Act because that section should be given a strictly prospective construction rendering it inapplicable to crimes and convictions which occurred prior to the day when the Act took effect in 1952. This contention, as observed in the government's brief, makes the unlikely assumption that Congress intended in 1952 to exempt those aliens from deportation who had already revealed the identical socially undesirable criminal traits which Congress now believes to be a sufficient basis to warrant the withdrawal of the privilege of continued residence in this country, and that Congress was concerned merely with those aliens who at some time in the future might display those characteristics. It would also follow that if an alien prior to 1952 had been convicted of a most heinous crime of moral turpitude, and after the effective date of the 1952 Act had been convicted of one other crime involving moral turpitude, he *could not be deported under § 241(a)(4)* because the section requires, under the suggested interpretation, a minimum of two convictions after the effective date of the Act. We think the statutory language clearly negatives this reading. Section 241(a) provides that any alien in the United States shall be deported who "(4) * * * *at any time after entry* is convicted of two crimes involving moral turpitude * * *." (Italics added.) This is to be contrasted with the language of § 241(a)(3), "hereafter, within five years after entry, * * *" and of § 241(a)(11), "* * * hereafter at any time after entry * * *." It is also significant that in the comparable provision of the predecessor Act, § 19 of the Act of 1917, 39 Stat. 889, Congress provided for the deportation of "* * * any alien who is *hereafter* sentenced to imprisonment for a term of one year or more * * * or who is *hereafter* sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, committed at any time after entry" (italics added); but Congress chose to omit the key word "hereafter" in § 241(a)(4) of the 1952 revised statute. Furthermore, § 241(d) lays to rest any possible doubt on the matter. That subsection reads: "Except as otherwise specifically provided in this section, the provisions of this section shall be applicable to all aliens belonging to any of the classes enumerated in subsection (a), notwithstanding (1) that any such alien entered the United States prior to the date of enactment of this Act, or (2) *that the facts, by reason of which any such alien belongs to any of the classes enumerated in subsection (a), occurred prior to the date of enactment of this Act.*" (Italics added.)

Certain additional points of a procedural nature are advanced by appellant. He says he was deprived of procedural due process in that the Special Inquiry Officer introduced in evidence a long police record involving Pino, and also certain FBI reports covering *Pino's continuous brushes with the criminal law*. Admittedly these were hearsay documents irrelevant to the legal issues involved in the charges on which deportation was sought. Their introduction before a jury trying contested issues of fact would no doubt have been prejudicial, for a reading of the documents tends to leave one with the impression that over the years Pino has shown himself to be a particularly undesirable alien,

if ever there was one. But if, as we have held as a matter of law, the authenticated and unchallenged records in the Massachusetts courts reveal that the alien, since his entry into the United States, has been convicted of two crimes involving moral turpitude, how can we conclude that the Special Inquiry Officer was in error in ordering Pino's deportation on the ground that such deportation was required by § 241(a)(4) of the Act? If the case went back for another administrative hearing, the same result would be inevitable. Other alleged procedural errors are strictly in the nature of grasping at straws, and we find no sufficient merit or plausibility in any of them to warrant special discussion.

The order of the District Court is affirmed.