**John Winston Ono LENNON, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondents.**

**No. 18, Docket 74–2189.**

United States Court of Appeals, Second Circuit.

Argued Sept. 4, 1975.

Decided Oct. 7, 1975.

---

Before KAUFMAN, Chief Judge, and MULLIGAN and GURFEIN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

We have come a long way from the days when fear and prejudice toward alien races were the guiding forces behind our immigration laws. The Chinese exclusion acts of the 1880's and the "barred zone" created by the 1917 Immigration Act have, thankfully, been removed from the statute books and relegated to the historical treatises. Nevertheless, the power of Congress to exclude or deport natives of other countries remains virtually unfettered. In the vast majority of deportation cases, the fate of the alien must therefore hinge upon narrow issues of statutory construction. To this rule, the appeal of John Lennon, an internationally known "rock" musician, presents no exception. We are, in this case, called upon to decide whether Lennon's 1968 British conviction for possession of cannabis resin renders him, as the Board of Immigration Appeals believed, an excludable alien under § 212(a)(23) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a)(23), which applies to those convicted of illicit possession of marijuana. We hold that Lennon's conviction does not fall within the ambit of this section.

Nathan Lewin, Washington, D. C., and Leon Wildes, New York City, for petitioner.

Mary P. Maguire, Sp. Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S.D.N.Y., and Mel P. Barkan and Naomi Rice Buchwald, Asst. U. S. Attys., of counsel), for respondent.

Jack Wasserman, Esther M. Kaufman, Washington, D. C., Donald L. Unger, San Francisco, Cal., and Mark A. Mancini, Washington, D. C., filed a brief for the Association of Immigration and Nationality Lawyers as amicus curiae urging reversal.

I.

To provide the necessary context for decision in this case, an overview of the factual background is appropriate.

On October 18, 1968, detectives from the Scotland Yard drug squad conducted a warrantless search of Lennon's apartment at 34 Montague Square, London. There, the officers found one-half ounce of hashish inside a binocular case and thereupon placed Lennon under arrest. Lennon pleaded guilty to possession of cannabis resin in Marylebone Magistrate's Court on November 28, 1968; he was fined £ 150.[1]

---

1. It is unnecessary to discuss the facts underlying Lennon's conviction in greater detail since they are not relevant to our decision. *See* note 17, *infra.*

On August 13, 1971, Lennon and his wife Yoko Ono arrived in New York. They had come to this country to seek custody of Mrs. Lennon's daughter by a former marriage to an American citizen.

It was at this point that the Lennons first met with the labyrinthine provisions of the Immigration and Nationality Act which were to result in the deportation proceedings which we review. Accordingly, a brief description of the relevant portions of that Act is here in order.

INA § 212(a), 8 U.S.C. § 1182(a), lists thirty-one classes of "excludable aliens" who are ineligible for permanent residence, and, indeed, are (with the exception provided by § 212(d)(3)(A)), unable to enter this country at all. This portion of the Act is like a magic mirror, reflecting the fears and concerns of past Congresses. Among those excludable is

any alien who has been convicted of a violation of . . . any law or regulation relating to the illicit possession of . . . marihuana (§ 212(a)(23))

Section 212(d)(3)(A) permits the INS, in its discretion, *temporarily* to waive excludability and to admit the alien under a temporary non-immigrant visa. When this visa expires, the alien must leave or face deportation. INA § 241(a)(2), 8 U.S.C. § 1251(a)(2). At any time after admission, however, the alien may petition for permanent resident status. INA § 245(a), 8 U.S.C. § 1255(a). This application can be, in effect, a challenge to his classification as an excludable alien.

Since Lennon's conviction appeared to render him excludable, the INS specifically waived excludability under § 212(d)(3)(A). The Lennons were then given temporary visas valid until September 24, 1971; the INS later extended the expiration date to February 29, 1972.

The day after Lennon's visa expired, March 1, Sol Marks, the New York District Director of the INS, notified the Lennons by letter that, if they did not leave the country by March 15, deportation proceedings would be instituted. On March 3, Lennon and his wife filed third preference petitions.[2] In response to these applications, the INS instituted deportation proceedings three days later. The INS, for reasons best known to them, did not act on the applications, and the Lennons were therefore unable to apply for permanent residence. After waiting two months, the Lennons filed suit in the Southern District for an injunction compelling the INS to rule on their petitions. *Lennon v. Marks,* 72 Civ. 1784.[3] At oral argument in that case, Marks advised the judge that the INS

---

**2.** A third preference petition is a preliminary application under INA § 245, 8 U.S.C. § 1255, for permanent residence. An alien admitted under a temporary visa must qualify for immigrant visa before applying for permanent residence. § 245. Visas are allocated on a quota system which gives preference to several groups, one of which, the "third preference", is given to "qualified immigrants who . . . because of their exceptional ability in the sciences or the arts will substantially benefit prospectively the national economy, cultural interests, or welfare of the United States." INA § 203(a)(3), 8 U.S.C. § 1153(a)(3). In order to receive this preference, the alien must file a petition with the INS. 8 C.F.R. § 204.1(c). He cannot apply for permanent residence until this petition has been approved. 8 C.F.R. § 245.2(2).

**3.** This case was one of three actions instituted by Lennon in the Southern District during the course of these prolonged proceedings. For the purpose of clarity we list these actions at

this point, although we discuss them in greater detail below:

1. *Lennon v. Marks, supra,* instituted in May 1972, was a suit for an injunction compelling the INS to act on Lennon's third preference petition, which the INS had pigeonholed. The suit became moot when the INS granted the petition.

2. *Lennon v. Richardson,* 73 Civ. 4476, instituted in October 1973, was an action brought under the Administrative Procedure Act, 5 U.S.C. § 552, to obtain INS records detailing the INS procedure of granting of "nonpriority status" to otherwise deportable aliens. The INS mooted this action by providing copies of 1,863 case files of aliens accorded nonpriority status.

3. *Lennon v. United States,* 73 Civ. 4543, instituted in October 1973, was a suit to enjoin Lennon's deportation on the grounds that he had been singled out for deportation because of his political beliefs. This action is still pending.

would consider the applications; they were approved within the hour.

In March, April, and May, 1972, deportation hearings were held before Immigration Judge Fieldsteel. On May 12, 1972, ten days after the INS finally approved their petition for third preference status, the Lennons applied to the Immigration Judge for permanent residence.[4] During the hearing, letters from many eminent writers, artists, and entertainers, as well as from John Lindsay, at that time the Mayor of New York, were submitted to show that, were the applications approved, the Lennons would make a unique and valuable contribution to this country's cultural heritage. The Government did not challenge Lennon's artistic standing, but instead contended that his 1968 guilty plea made him an excludable alien, thus mandating the denial of his application. Lennon countered by arguing that he was not excludable under § 212(a)(23) since he had not been convicted of violating a law forbidding *illicit* possession. Under British law, Lennon urged, guilty knowledge was not an element of the offense. Lennon further argued that, by commencing deportation proceedings while he was seeking custody of his wife's child,[5] the agency had violated its hitherto invariable practice and therefore had abused its discretion.[6]

The Immigration Judge filed his decision on March 23, 1973. Since Yoko Ono had obtained permanent resident status in 1964, he granted her application. But, because he believed that Lennon was an excludable alien, the Immigration Judge denied his application and ordered him deported. The Immigration Judge also held that it was not within his province to review the Director's decision to begin deportation proceedings.

Lennon sought review of the Immigration Judge's decision before the Board of Immigration Appeals. He also began a collateral action in the Southern District in which he sought to enjoin his deportation. He was deserving of this relief, he contended, since the District Director and the Immigration Judge had prejudged his case. The INS had, he said, instituted deportation proceedings because they feared he might participate in demonstrations that would be highly embarrassing to the then-existing administration. In January, 1975, Judge Owen denied a government motion for summary judgment. *Lennon v. United States,* D.C., 387 F.Supp. 561 (1975).

Meanwhile, on July 10, 1974, the Board filed its decision. The Board conceded that § 212(a)(23) does not exclude aliens convicted of possession under laws which made knowledge immaterial to the offense. However, the Board concluded that

a person who was entirely unaware that he possessed any illicit substance would not have been convicted under

---

4. Since deportation proceedings had been commenced, Lennon was required to make the application directly to the Immigration Judge. 8 C.F.R. § 242.17(a), § 245.2(a)(1).

5. The custody fight was—and is—unresolved. The District Court of the Virgin Islands awarded custody of Mrs. Lennon's daughter by her prior marriage to the Lennons in September 1971, *Cox v. Cox,* Civ. 20–1969, *aff'd* 457 F.2d 1190, 3 Cir., (1972), but Mrs. Lennon's former husband fled to Texas with the child. A Texas court gave the Lennons custody, but limited its exercise to the territorial limits of the United States. *Cox v. Lennon,* Court of Domestic Relations, Harris County, Texas, No. 876,663 (1973). Mr. Cox, however, once again promptly absconded with the child.

6. In response to Lennon's action in the Southern District, *Lennon v. Richardson, supra,* the INS produced records of 1,863 deportable aliens against whom deportation proceedings had not been instituted. Of these, more than 150 involved narcotics convictions. Many aliens granted such status had criminal records far more serious than Lennon's. Some were convicted of murder or rape, and one was described in his file as "an admitted heroin addict" who was reputedly one of the "largest suppliers of marijuana and narcotics in the area." This unsavory alien was not deported because his wife and child were United States citizens. Lennon's child was, of course, an American citizen and, during the hearing, it was discovered that Lennon's wife had obtained permanent residence status in 1964, while married to her first husband.

the [British] Dangerous Drugs Act of 1965.  (p. 25)

The Board also held that it was without jurisdiction to consider Lennon's claim that he was improperly denied nonpriority status.  Accordingly, the Board concluded that Lennon was ineligible for permanent residence and affirmed the Immigration Judge's deportation order.[7]

## II.

It is within the context of these issues that we must decide the merits of this appeal.  INA § 212(a), 8 U.S.C. § 1182(a), provides:

> [T]he following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States  .  .  .  (23) Any alien who has been convicted of a violation of, or conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marihuana  .  .  .  .

The Immigration Judge and the Board of Immigration Appeals believed that Lennon's 1968 conviction made him excludable under this section.  We are of the view that it did not.  We base this result upon our conclusion that (A) Lennon was convicted under a law which in effect makes guilty knowledge irrelevant and that (B) a foreign conviction for possession of marijuana under such a law does not render the convicted alien excludable.           ,

### A.  Lack of Knowledge Requirement under British Law in 1968

The language of the British statute under which Lennon was convicted is deceptively simple: "A person shall not be in possession of a drug unless  .  .  .  authorized  .  .  ."[8]  But around this concise provision, judicial interpretation has created a scholastic maze as complex and baffling as the labyrinth at Knossos in ancient Crete.

The most authoritative judicial pronouncement on the knowledge requirements of the British act is *Warner v. Metropolitan Police Commissioner,* [1969] 2 A.C. 256, [1968] 2 All E.R. 356.  The facts in that case were relatively simple.  The luckless Warner was stopped by police while he was driving his van.  Inside a box in the back of the vehicle, police found twenty thousand amphetamine tablets.  Warner claimed ignorance; he had, he said, been given the parcel by a friend who had told him that it contained perfume, which Warner sold as a sideline.  The House of Lords was called upon to decide whether Warner would be guilty of amphetamine possession even if he did indeed believe that his package held perfume.

Each of the five Law Lords delivered a separate opinion.  All save Lord Reid agreed that, once possession was proven, liability was absolute and mental state irrelevant.  They felt that, to require the prosecution to prove full mens rea would, in Lord Guest's words, create a "drug peddlar's charter in which a successful prosecution will be well-nigh impossible."  [1969] 2 A.C. at 301, [1968] 2 All E.R. at 384.  The Lords recognized, however, that it was unfair for a person to be held criminally liable if it appeared that the drugs had, for example, been "planted" by an enemy.  The Lords sought a halfway house between equity and efficiency that would permit many if not most blameless defendants to go free without allowing the guilty to escape in sheep's clothing.  To do this, they resurrected a hoary line of cases which had held, in the context of larceny statutes, that some knowledge must be proved to establish *possession.*

---

7.  After oral argument was heard on this appeal, the INS on September 23, 1975, accorded Lennon "nonpriority status", which is, in effect, an informal administrative stay of deportation.  The deportation order, however, remains in effect suspended, and may be executed at any time.  The grant of nonpriority status, moreover, does not affect the Board's holding that Lennon is ineligible for permanent residence.

8.  Section 3, Dangerous Drugs (No. 2) Regulations.  Anyone who violates these regulations is made guilty of a criminal offense by § 13 of the Dangerous Drugs Act 1965.

The peers' progress up to this point was relatively straightforward. But the question of how much knowledge should be required for possession precipitated a verbal Donnybrook Fair. From the ensuing tangle of rhetoric, two conclusions emerged. First, four of the Lords adopted the conclusion of the Queen's Bench Division in an earlier case, *Lockyer v. Gibb,* [1967] 2 Q.B 243, [1966] 2 All E.R. 653, that a person who is aware that he has a substance possesses it even if he is mistaken as to its qualities. [1969] 2 A.C. at 290, [1968] 2 All E.R. at 375–76 (Morris); A.C. at 299–300, All E.R. at 383–84 (Guest); A.C. at 305, 307, All E.R. at 388, 390 (Pearce); A.C. at 311, All E.R. at 393 (Wilberforce). *See* A. L. Goodhart, Possession of Drugs and Absolute Liability, 84 L.Q.Rev. 382, 389 (1968), Comment, Possession of Drugs— The Mental Element, 26 Camb.L.J. 179, 181 (1968), Comment, Possession and Absolute Liability, 32 Mod.L.Rev. 202, 204– 05 (1969). The grave import of this holding is made clear by the striking example used by Lord Pearce:

> Though I reasonably believe the tablets which I possess to be aspirin, yet if they turn out to be heroin I am in possession of heroin tablets. This would be so I think even if I believed them to be sweets.

[1969] 2 A.C. at 305, [1968] 2 All E.R. at 388.

The second holding which may be gleaned from *Warner* deals with the so-called "package cases". In these cases, the defendant possesses a box or container but is either mistaken as to its contents or thinks it empty; the package in fact contains drugs. Three of the Lords held that such a person would be guilty if he had a chance to open the parcel, the right to do so, and (perhaps) some indication that the package was not empty; that he never availed himself of the opportunity to open the container would be of no importance. [1969] 2 A.C. at 296, [1968] 2 All E.R. at 381 (Morris); A.C. at 301–02, All E.R. at 385 (Guest); A.C. at 306, 307–08, All E.R. at 389, 390 (Pearce). *See* Comment, *supra,* 26 Camb.L.J. at 180–81, Comment, *supra,* 32 Mod.L.Rev. at 205–06. Under British law, as Lord Pearce stated,

> a man takes over a package or suitcase at risk as to its contents being unlawful if he does not immediately examine it (if he is entitled to do so).

A.C. at 306, All E.R. at 389.[9]

We conclude from this analysis of British law as it existed in 1968 that Lennon was convicted under a statute which made guilty knowledge irrelevant. A person found with tablets which he reasonably believed were aspirin would, under the *Warner* holding, be convicted if the tablets proved to contain heroin. And a man given a sealed package filled with heroin would, if he had had any opportunity to open the parcel, suffer the same fate—even if he firmly believed the package contained perfume.[10]

---

**9.** Although our dissenting brother Mulligan deems the *Warner* opinions "hardly as clear as a mountain lake in springtime," the English courts have found *Warner* sufficiently pellucid. Indeed, in one of the cases upon which our brother relies, the unanimous court recognized *Warner* to have held that

> If a man is in possession of a box and he knows there are articles of some sort inside it and it turns out that the contents comprise, for example, cannabis resin, it does not lie in his mouth to say: 'I did not know the contents included resin.'

*Regina v. Marriott,* 55 Cr.App.R. 82 [1971] 1 All E.R. 595.

We can assume that Parliament does not waste its time with the enactment of superfluous statutes, nor does it conserve its time by unnecessarily tinkering with statutes interpret-ed to its satisfaction by the Courts. We note, therefore, that Parliament repealed the Dangerous Drugs Act and passed the Misuse of Drugs Act in 1971, believing it necessary to provide explicitly that a defendant should be acquitted "if he proves that he neither believed nor suspected nor had reason to suspect that the substance or product in question was a controlled drug." § 28(3)(b).

**10.** Our reading of *Warner* differs from the interpretation of that authority by our brother. Our view that the British statute lacked a requirement of *guilty* knowledge is not negated by any of the cases cited in the dissent. Every case cited by Judge Mulligan stands for the principle that the defendant must merely have known that he possessed an *object,* that is, he was required to know that "something" was in his possession, *e. g.,* a "package," tablets of

B. *Knowledge Requirement of INA § 212(a)(23)*

Any analysis of § 212(a)(23) must find its starting point in the statute's plain language. That language provides compelling evidence of a knowledge requirement, for it renders excludable "any alien who has been convicted of a violation of . . . any law or regulation relating to the *illicit* possession of . . . marihuana." [Emphasis ours] [11]

■ This unambiguous wording is bolstered by several well-established principles of statutory construction which we must apply here. It is settled doctrine that deportation statutes must be construed in favor of the alien.

[S]ince the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used.

*Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433 (1948). *See e. g. Costello v. INS,* 376 U.S. 120, 128, 84 S.Ct. 580, 11 L.Ed.2d 559 (1964), *Bonetti v. Rogers,* 356 U.S. 691, 699, 78 S.Ct. 976, 2 L.Ed.2d 1087 (1958).

■ It is equally well settled that we must accord some deference to an administrative agency's interpretation of its governing statute. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). We therefore find it relevant that the Board held that "Congress did not intend to exclude persons who were entirely unaware that a prohibited substance was in their possession." (p. 14)

■ Finally, we must decide the proper construction of § 212(a)(23) in the light of the deeply rooted requirement of knowledge and intent in our legal system.[12] *See Morrisette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Although some minor inroads on this principle have been made by the so-called "regulatory" crime statutes, such laws have, in the main, either imposed petty penalties, *see Tenement House Dept. v. McDevitt,* 215 N.Y. 160, 168, 109 N.E. 88 (1915, Cardozo, J.), or have reached only those who, by virtue of their position or past acts, have been in effect put on notice that a high standard of care is required of them, *see United States v. Freed,* 401 U.S. 601, 609, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922). Neither category applies here.

■ Deportation is not, of course, a penal sanction. But in severity it surpasses all but the most Draconian criminal penalties. We therefore cannot deem wholly irrelevant the long unbroken tradition of the criminal law that harsh sanctions should not be imposed where moral culpability is lacking.

We are now called upon to decide whether the exclusion of convictions for possession obtained under laws imposing

any kind or description, etc. There was no requirement, however, that he know the *contents* of the package or the *characteristics* of the tablets. For example, it was not a defense that the charged party was ignorant of the fact that the "tablets" contained heroin or any other drug. It is interesting that no case cited by our dissenting brother takes issue with this interpretation. Our dissenting brother seems to have overlooked the distinction between the two different types of knowledge which the British cases so clearly recognized. It was probably because this distinction was not perceived that our brother failed to include the two crucial sentences which immediately follow the passages quoted in his dissent from A. L. Goodhart's analysis of *Lockyer:*

Strange to say, however, it was only a dictum in the *Lockyer* case [that a woman could not be in possession of something which had been slipped into her basket without her knowledge] because the defendant knew that the bottle of tablets was in her carry-all, and she also knew that it contained tablets. *All that she claimed not to know was that the tablets contained drugs.* (Emphasis added.) Mrs. Lockyer's ignorance of the tablets' contents was insufficient to warrant reversal of her conviction.

11. We note that if "illicit" merely meant "unlawful", it would be redundant.

12. It is also relevant that the Federal drug possession statute specifically requires mens rea. 21 U.S.C. § 844(a).

absolute liability would significantly impede the enforcement or undermine the purpose of the Immigration and Nationality Act. If we find that it does not, then we cannot, in the light of these firmly established precepts of statutory construction, conclude that Congress intended to include such convictions within the ambit of § 212(a)(23).[13]

■ The general purpose of § 212 is, of course, to bar undesirable aliens from our shores. *See* 1952 U.S.Code Cong. and Adm.News, pp. 1653, 1698. There is also, we note, some indication that Congress, in enacting § 212(a)(23), was far more concerned with the trafficker of drugs than with the possessor. *See* 1956 U.S.Code Cong. and Adm.News, at pp. 3280–81, *cf. Varga v. Rosenberg,* 237 F.Supp. 282 (S.D.Cal.1964).

We do not believe that our holding will subvert these Congressional ends.[14]

**13.** It is also relevant to our task of statutory construction that the Supreme Court has held in *other contexts* that

The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.

*Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). *See Aptheker v. Secretary of State,* 378 U.S. 500, 512–14, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), and *Elfbrandt v. Russell,* 384 U.S. 11, 18, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966).

**14.** Nor is it irrelevant that, in 1974, Parliament enacted the Rehabilitation of Offenders Act, an expunction statute which wiped out convictions for minor offenses, including Lennon's provided the convicted person had kept his record free of serious offenses for five years. It is reasonable that weight should be given to a legislative determination by the country which imposed the conviction that it is not evidence of bad character.

**15.** The dissenting opinion revives the not unfamiliar "House of Horrors" argument suggesting that our interpretation of § 212(a)(23) will permit hordes of undesirables to descend upon the United States. There is no merit to this scare argument and it was not ignored in the consideration of this case by the majority. We have already disposed of this contention. [*See* text]. We note, in addition, that the Attorney General has ample powers to deal with knowing narcotics law violations. Section 212(a)(27), 8 U.S.C. § 1182(a)(27) renders excludable:

Virtually every undesirable alien covered by the drug conviction provision would also be barred by other sections of the statute. Thus, the statute makes excludable

any alien who the consular officer or immigration officers know or have reason to believe is or has been an illicit trafficker in . . . drugs. § 212(a)(23)

Moreover, addicts are barred by § 212(a)(5). Finally, our holding will not, of course, give any comfort to those convicted in the United States of drug violations.[15]

■ Given, in sum, the minimal gain in effective enforcement, we cannot imagine that Congress would impose the harsh consequences of an excludable alien classification upon a person convicted under a foreign law that made guilty knowledge irrelevant.[16] We hold that it did not.[17]

Aliens who the consular officer or the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States.

**16.** Whether Lennon himself lacked guilty knowledge is immaterial. It is "elementary"—as our dissenting brother concedes—that in a deportation proceeding we cannot go behind a guilty plea to try the case anew. To make the facts of each individual case determinative would require the Board or the reviewing court to, in effect, retry the case on which the conviction was based. This, of course, would pose insurmountable obstacles. Witnesses would be scarce or impossible to find and the deportation proceedings would be interminably delayed. In addition, the events may well have occurred in foreign lands and in the dim past. All we can consider is whether the statute permits the conviction of an individual who would be quite innocent under our system of criminal justice. We thus are baffled by our brother's insistence on examining the facts underlying Lennon's conviction. If Judge Mulligan is asserting that *no one* without mens rea could be convicted under the British statute, nothing is added by discussing Lennon's individual case and ignoring the *Warner* aspirin-heroin example. Perhaps our colleague is tacitly conceding that *some* defendants who lack *certain varieties* of mens rea could be found

We base our decision in this appeal solely upon our interpretation of § 212(a)(23) of the Immigration and Nationality Act. We deem it appropriate, however, to add a brief word on Lennon's contention that he was singled out for deportation because of his political activities and beliefs.

■ Although the Board rejected Lennon's selective enforcement defense as beyond their jurisdiction, we do not take his claim lightly. This issue, however, is not presented to us for determination. At oral argument, Lennon's counsel agreed not to press this point unless we found Lennon to be excludable under § 212(a)(23). We note, nonetheless, that if Lennon's application for permanent residence should be denied for discretionary reasons after our mandate is received, Judge Owen will proceed expeditiously to hear Lennon's claim and accord him the relief to which he may be entitled. The courts will not condone selective deportation based upon secret political grounds. It would be premature for us to be more specific, since the facts underlying Lennon's claim of selective prosecution have not been developed sufficiently for appellate review.

Before closing with the traditional words of disposition, we feel it appropriate to express our faith that the result we have reached in this case not only is consistent with the language and purpose of the narrow statutory provision we construe, but also furthers the intent of the immigration laws in a far broader sense. The excludable aliens statute is but an exception, albeit necessary, to the traditional tolerance of a nation founded and built by immigrants. If, in our two hundred years of independence, we have

in some measure realized our ideals, it is in large part because we have always found a place for those committed to the spirit of liberty and willing to help implement it. Lennon's four-year battle to remain in our country is testimony to his faith in this American dream.

Accordingly, the denial of Lennon's application for adjustment of status and the order of deportation are vacated and the case remanded for reconsideration in accordance with the views expressed in this opinion.

MULLIGAN, Circuit Judge (dissenting):

As the majority opinion observes, Lennon's claim that he is the victim of selective prosecution is an issue not before this court but rather is *sub judice* in the Southern District, and therefore we cannot appropriately discuss its merits. The sole issue before us is whether Lennon is an excludable alien under INA § 212(a)(23).

That statute would exclude *any* alien who has been convicted of a violation of *any* law or regulation relating to the illicit possession of narcotic drugs or marihuana. Since the statute applies to any alien it makes no difference whether he be John Lennon, John Doe or Johann Sebastian Bach. Great Britain has made the possession of cannabis resin (marihuana) without authorization illicit (§ 3, Dangerous Drugs (No. 2) Regulations, under the Dangerous Drugs Act 1965). It is further conceded that Lennon pleaded guilty to the possession of that drug on November 28, 1968 and was fined £ 150. From these premises one would logically conclude that Lennon should be excluded from the United States.

guilty under English law. If so, it is inconsistent to look behind Lennon's conviction for facts revealing that Lennon was not such a defendant, while refusing to hold that the same facts—which, if true, establish, as Judge Mulligan stated, that Lennon "could not have properly been convicted"—render him nonexcludable. (We note that Lennon was excluded solely because of his British conviction.) In any event, there was no trial or hearing preceding Lennon's guilty plea and conviction,

and Judge Mulligan's factual discussion thus relies upon unsupported statements contained in briefs.

17. We therefore find it unnecessary to rule upon Lennon's contentions that the British expunction statute had wiped out his conviction for purposes of § 212(a)(23), and that his hashish conviction is not a conviction of possession of "marihuana" for purposes of that section.

The majority argues however that § 212(a)(23) should not be interpreted to exclude from this country those who are innocently in possession of an illicit drug. I agree but I cannot agree that Lennon was convicted under a statute which imposes "absolute liability" and makes the knowledge of the defendant "irrelevant." The five opinions in *Warner v. Metropolitan Police Commissioner,* [1969] 2 A.C. 256, [1968] 2 All E.R. 356, which interpret the British statute, are hardly as clear as a mountain lake in springtime but there is a consensus on basic principles.

Lennon claims here that the drugs were concealed in a binocular case in a closet of his apartment and that he had absolutely no idea of their presence. There is the further suggestion that they may have been "planted" by the arresting constable who it is alleged was at the very least overzealous in prosecuting rock musicians. Assuming that Lennon's version of the facts is accurate, it is my view that he could not have been properly convicted in Great Britain of the offense charged.[1]

In *Warner* Lord Pearce clearly held the view that the Parliament did not intend to impose absolute liability in the Drugs Act of 1965. "It is conceded by the Crown that these words [have in possession] do not include goods slipped into a man's pocket without his knowledge" ([1968] 2 All E.R. at 386). He also quoted with approval the dictum of Lord Parker in *Lockyer v. Gibb* [1967], 2 Q.B., 243, 248 [1966], 2 All E.R. 653, 655:

In my judgment, it is quite clear that a person cannot be said to be in possession of some article which he or she does not realize is, or may be, in her handbag, in her room, or in some other place over which she has control. That I should have thought is elementary; if something were slipped into one's basket and one had not the vaguest notion it was there at all, *one could not possibly be said to be in possession of it.*

(Emphasis added).

The very same paragraph of Lord Parker's opinion in *Lockyer v. Gibb* was cited with approval by all of the other law Lords who sat in *Warner* (Lords Guest ([1968] 2 All E.R. at 383), Morris (id. at 372–73), Wilberforce (id. at 393), and Reid (id. at 387)).

That this position of Lord Parker in *Lockyer v. Gibb* represented the view of all five Lords who wrote in *Warner* is fortified by the comments of A. L. Goodhart, Editor of the Law Quarterly Review in his article "Possession of Drugs and Absolute Liability," 84 L.Q.Rev. 382, 391–92 (1968). After citing the Parker dictum in *Lockyer* to which we have referred, he noted:

This statement is of outstanding importance because it was accepted as a self-evident statement of the law by all the judges, both in the Court of Appeal and in the House of Lords, in the present case [*Warner*]. It was the foundation-stone on which their judgments were based.

It must be further observed that this was the interpretation given to *Warner* in later English opinions.[2] This unani-

---

1. With respect to the arrest, we have no record before us except the memorandum of the conviction which reveals only the conviction and makes no reference to the amount of cannabis resin discovered or the exact place where it was found. The brief submitted by the American Civil Liberties Union on Lennon's behalf before the Bureau of Immigration Appeals states that the drug was found in three different containers in a closet in Lennon's apartment. Although the majority chides me for discussing the facts, I am accepting them as urged in Lennon's brief before this court. There is no admission by Lennon and no contention by the Government that

Lennon knew that the illicit drug was physically present in the closet but that he had no idea that it was cannabis resin. Hence Lord Pearce's aspirin-heroin example relied upon by the majority is not relevant. Moreover, it must be understood in the context of his further comment: "On the other hand, I do not think that Parliament intended to make a man guilty of possessing something when he did not know that he had the thing at all." [1968] 2 All E.R. at 388.

2. In *Sweet v. Parsley,* [1969] 1 All E.R. 347 (H.L.) four of the five lords who had earlier written in *Warner* (all but Lord Guest) were

mous position in *Warner* is emphasized here because Lennon's case precisely fits the example posed by Lord Parker in *Lockyer* and unanimously approved in *Warner*. Lennon's position has been either that the cannabis resin was planted by the police or that in any event he was totally ignorant of its presence in the binocular case. His counsel must also have so read *Warner* since as the opinion below reveals his solicitors told him after his arrest that he stood a good chance of acquittal at trial.

In light of this discussion I cannot accept the majority view that Lennon was convicted under a law which imposed absolute liability and eliminated mens rea. If ignorant of the drug's presence he would not have had possession under English law and could not have been properly convicted.

The undisputed fact however is that Lennon did plead guilty to the possession of cannabis resin, and while this may have been convenient or expedient because of his wife's pregnancy and his disinclination to have her testify in court, it is elementary that we cannot go behind the plea. *Rassano v. INS,* 377 F.2d 971, 974 (7th Cir. 1967); *Giammario v. Hurney,* 311 F.2d 285, 287 (3d Cir. 1962); *Pino v. Nicolls,* 215 F.2d 237, 245 (1st Cir. 1954), rev'd on other grounds sub nom. *Pino v. Landon,* 349 U.S. 901, 75 S.Ct. 576, 99 L.Ed. 1239 (1955). Since

Lennon was convicted under a statute which did not impose liability absolutely but required knowledge on the part of the defendant where the contraband is secreted in a container, I cannot concur in the result reached by the majority.

The majority here further concludes that a foreign conviction for the *possession of marijuana* under the British statute or any similar foreign law does not render the convicted alien excludable. They argue that the Congress was more concerned with trafficking in drugs than in possession and their opinion does not cover the trafficker who obviously is fully aware of the nature of the business he is pursuing. The statute (INA § 212(a)(23)) however bars the possessor as well as the trafficker. If there were no users there would be no trafficking.

Great Britain bars the unauthorized possession not only of cannabis resin but raw opium, coca leaves (from which cocaine is extracted) and other substances as well. Congress has also barred from this country those aliens who have been convicted of the possession not only of marihuana but other illicit drugs. Although the majority limits its holding to a marihuana conviction under the British statute or any foreign counterpart, its reasoning would compel the same result if the drug at issue were heroin or cocaine. It must also be emphasized that the vast majority of those who are ar-

asked to construe another provision, of the 1965 Dangerous Drugs Act, which made it an offense for an occupier or manager of premises to permit them to be used for the smoking of cannabis or for dealing in the drug. In construing that provision the lords discussed again their opinion in *Warner*. Three expressed the view that the possession dealt with in *Warner* meant knowing possession (Pearce, id. at 358; Wilberforce, id. at 360; and Diplock, id. at 361). Lord Morris, as he did in *Warner*, again cited *Brend v. Wood,* [1946] 175 L.T. 306, 307: "[A] court should always bear in mind that, unless a statute, either clearly or by necessary implication rules out mens rea as a constituent part of a crime, the court should not find a man guilty of an offence against the criminal law unless he has a guilty mind." ([1969] 1 All E.R. at 353). See also Lord Reid, id. at 350, 351.

In *Regina v. Marriott,* [1971] 1 All E.R. 595 (C.A.), the defendant's house was raided by

the police who found a penknife with traces of cannabis resin adhering to a broken blade. His conviction was quashed on appeal. In construing *Warner* the court noted, "[i]t does not seem to us to be the law that proof of the mere possession of the penknife, without more, was enough." Id. at 597.

In *Regina v. Fernandez,* [1970] Crim.L.Rev. 277, the Court of Appeal observed: "The majority view in *Warner* was that one could not safely regard the offence as absolute: some mental element, or subjective test, might have to be applied." Id. at 278.

Finally, we note that in the Parliamentary debates over the revision of the Misuse of Drugs Act in 1971, although a Member of Parliament indicated that he believed that *Warner* created absolute liability, regardless of mens rea, the Solicitor-General's response indicated that the revision was a codification of *Warner* rather than a rejection of it. 808 Parl.Deb., H.C. (5th ser.) 621 (1970).

rested with illicit drugs in their homes or on their persons are users who are fully aware of their presence and their properties. It is the unusual case where contraband such as this is surreptitiously planted in one's reticule or blue jeans pocket. Yet by disregarding convictions under the British statute or any other foreign counterpart, the majority would admit to the United States those who knowingly possessed any illicit drugs. This holding seems to me to conflict with INA § 212(a)(23) which plainly bars those who have been convicted of a violation of "any law or regulation relating to the illicit possession of . . . narcotic drugs or marihuana". Lennon's guilty plea here puts him within the statute.

The holding here will undoubtedly and unfortunately result in the abandonment of Lennon's claim of selective prosecution now pending in the Southern District Court. If others found guilty of the same crime have been permitted entry and Lennon has been barred because he is John Lennon, the jongleur, and not John Doe, then that contention should be litigated not only in the interests of Lennon and INS but the public as well.