# Matter of Roberto CARDENAS ABREU, Respondent

File A046 046 300 - Marcy, New York

*Decided May 4, 2009*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

A pending late-reinstated appeal of a criminal conviction, filed pursuant to section 460.30 of the New York Criminal Procedure Law, does not undermine the finality of the conviction for purposes of the immigration laws.

FOR RESPONDENT: Pro se

FOR THE DEPARTMENT OF HOMELAND SECURITY: Laura A. Michalec, Assistant Chief Counsel

BEFORE: Board En Banc: OSUNA, Chairman; HOLMES, FILPPU, MALPHRUS, and MULLANE, Board Members. Concurring Opinions: GRANT, Board Member; PAULEY, Board Member, joined by COLE, Board Member. Dissenting Opinion: GREER, Board Member, joined by NEAL, Vice Chairman; MILLER, HESS, ADKINS-BLANCH, and WENDTLAND, Board Members.

MALPHRUS, Board Member:

In a decision dated October 30, 2008, an Immigration Judge denied the respondent's motion to reopen his proceedings, in which he argued that his criminal conviction was not final because he had been granted permission to file a late appeal. The respondent has appealed from that decision. The appeal will be dismissed.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of the Dominican Republic who was admitted to the United States as a lawful permanent resident on June 26, 1996. On October 11, 2007, the respondent was convicted of first degree burglary in violation of section 140.30 of the New York Penal Law.[1] The record reflects that he failed to file an appeal within the 30-day deadline provided in

---

[1] These undisputed facts are drawn from State court filings presented below. *See generally Matter of A-S-B-*, 24 I&N Dec. 493, 498 (BIA 2008).

section 460.10(1)(a) of the New York Criminal Procedure Law. The respondent was placed in removal proceedings and was charged under section 237(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(A)(iii) (2006), as an alien convicted of an aggravated felony. The Immigration Judge ordered him removed in a decision dated July 22, 2008. The respondent did not appeal that decision.

In a motion dated August 15, 2008, the respondent requested that the State criminal court grant him permission to file a late appeal pursuant to section 460.30 of the New York Criminal Procedure Law. Over opposition from the State, the court granted the respondent's motion on September 26, 2008, reinstating the time for filing an appeal. The respondent filed a motion to reopen his removal proceedings on October 14, 2008, claiming that his criminal conviction was not final because he had been granted permission to file a late appeal.[2] The Department of Homeland Security ("DHS") opposed the motion to reopen, arguing that the respondent's conviction remained final and valid for immigration purposes. The Immigration Judge concluded that the respondent's conviction remained a valid predicate for the charge of removability and denied the respondent's motion to reopen.

## II. ANALYSIS

In 1996, Congress enacted section 322(a)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-628 ("IIRIRA"), which set forth a definition of the term "conviction." This definition is in section 101(a)(48)(A) of the Act, 8 U.S.C. § 1101(a)(48)(A) (2006), which provides as follows:

> The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—
> (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
> (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

Initially, we must "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Issues regarding whether the language is plain and unambiguous are "determined by reference to the

---

[2] The granting of this motion to reopen would require that these removal proceedings be terminated. Also, the respondent would not be subject to the custody of the Department of Homeland Security on this basis.

language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341.

The DHS argues that under the plain language of section 101(a)(48)(A) of the Act, the respondent has a conviction because the State criminal court entered "a formal judgment of guilt" on October 11, 2007. The DHS therefore contends that even if the respondent had filed a direct appeal within 30 days of his conviction, the conviction would still be valid for immigration purposes. On the other hand, the respondent essentially argues that the language of section 101(a)(48)(A) is ambiguous as to the "particular dispute in the case," *id.* at 340, specifically, the question of finality, and he claims that under case law that preceded the enactment of the IIRIRA, his conviction is not final for purposes of the immigration laws. It is not necessary to adopt either argument to determine the issue presented in this case.[3]

A.

When Congress enacted the IIRIRA and defined the term "conviction" for the first time, it expressed a clear intent to address convictions in the deferred adjudication context. Congress was concerned that convictions in this context should not be "dependent on the vagaries of State law" and intended to prevent the various ameliorative State court proceedings from undermining the immigration consequences of a violation of State criminal laws. *Matter of Punu*, 22 I&N Dec. 224, 229 (BIA 1998). Congress achieved this result by adopting almost verbatim key portions of our earlier decision in *Matter of Ozkok*, *supra*, at 551-52, which set forth a standard for determining the existence of a conviction for immigration purposes. But it also expanded the *Ozkok* definition of a conviction by eliminating that part of the standard under which a deferred adjudication was a conviction only if a judgment of guilt could be entered "without availability of further proceedings" in which

---

[3] In *Puello v. Bureau of Citizenship and Immigration Services*, 511 F.3d 324, 332 (2d Cir. 2007), the United States Court of Appeals for the Second Circuit, within whose jurisdiction this case arises, reasoned in dicta that the statutory definition of the term "conviction" in section 101(a)(48)(A) eliminated the finality requirement. However, that case related to the effective date of a conviction and did not involve a challenge based on the appeal of a conviction. Other circuit courts that have addressed the principle of finality since the enactment of the IIRIRA have applied disparate analyses to reach different conclusions, and none has considered the issue in the context of a late-reinstated appeal. *See Paredes v. Att'y Gen. of U.S.*, 528 F.3d 196 (3d Cir. 2008); *Garcia-Maldonado v. Gonzales*, 491 F.3d 284 (5th Cir. 2007); *United States v. Saenz-Gomez*, 472 F.3d 791 (10th Cir. 2007); *United States v. Garcia-Echaverria*, 374 F.3d 440 (6th Cir. 2004); *Montenegro v. Ashcroft*, 355 F.3d 1035 (7th Cir. 2004); *Griffiths v. INS*, 243 F.3d 45 (1st Cir. 2001).

to contest the alien's guilt. Thus, Congress provided that an alien who has a deferred adjudication with a finding of guilt and a punishment, penalty, or restraint on liberty has been convicted of the offense, regardless of the potential for further ameliorative criminal proceedings to affect that determination of guilt. *See Matter of Punu*, *supra*, at 227; *see also* H.R. Rep. No. 104-828, at 224 (1996) (Conf. Rep.), 1996 WL 563320 (stating that the "new provision, by removing the third prong of Ozkok, clarifies Congressional intent that even in cases where adjudication is 'deferred,' the original finding or confession of guilt is sufficient to establish a 'conviction' for purposes of the immigration laws").

At the time the IIRIRA was enacted, it was well established in immigration law that a criminal conviction attains finality for immigration purposes when procedures for direct appeal have been exhausted or waived. *See Matter of Ozkok*, 19 I&N Dec. 546, 552 n.7 (BIA 1988); *see also, e.g.*, *Morales-Alvarado v. INS*, 655 F.2d 172, 175 (9th Cir. 1981); *Aguilera-Enriquez v. INS*, 516 F.2d 565, 570 (6th Cir. 1975). This well-accepted principle can be traced to the decision of the United States Supreme Court in *Pino v. Landon*, 349 U.S. 901 (1955). The legislative history of the IIRIRA accompanying the adoption of the definition of a "conviction" gave no indication of an intent to disturb this principle that an alien must waive or exhaust his direct appeal rights to have a final conviction. *See Matter of Punu*, *supra*, at 227 (discussing the legislative history of the term "conviction" in section 101(a)(48)(A) of the Act).[4] With this backdrop regarding the broad context of this issue and the statute, a forceful argument can be made that Congress intended to preserve the long-standing requirement of finality for direct appeals as of right in immigration law. *See Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 530-31 (1998) (holding that Congress implicitly adopted the Supreme Court's well-established definition of terms regarding a central issue in Indian law of what constitutes "Indian country" when it adopted language "taken virtually verbatim from" prior caselaw).

We need not resolve that issue, however, because the case before us involves a late-reinstated appeal, not a direct appeal. At the time Congress acted in 1996, there was no understanding of the effect on finality of late-reinstated appeals similar to the well-established rule for direct appeals. The Board expressly reserved this question less than 2 years before the

---

[4] At the time, there were other provisions of the Act that expressly included a requirement that a judgment be final, but Congress did not amend any of them. *Compare* former section 241(a)(2)(D) of the Act, 8 U.S.C. § 1251(a)(2)(D) (1994) (regarding the deportability of "[a]ny alien who at any time has been convicted (the judgment on such conviction becoming final)"), *with* section 237(a)(2)(D) of the Act, 8 U.S.C. § 1227(a)(2)(D) (2006) (same).

enactment of the IIRIRA in *Matter of Polanco*, 20 I&N Dec. 894 (BIA 1994), declining to decide whether late-reinstated appeals (also known as appeals taken nunc pro tunc, or "now for then") should be accorded the same treatment with regard to finality as direct appeals as of right. Thus, regardless of the strength of the argument that Congress intended to preserve the traditional treatment of direct appeals, that argument fails in the context of late-reinstated appeals because Congress could not have intended to preserve something that did not exist.[5]

## B.

Congress's treatment of deferred adjudication proceedings in the IIRIRA informs our approach to late-reinstated appeals because both procedures present an added measure of delay and uncertainty regarding the consequences of criminal convictions in immigration proceedings. In order to resolve the issue left open in *Matter of Polanco*, *supra*, we look first to the statute.

Section 101(a)(48)(A) of the Act provides that a conviction exists when a "formal judgment of guilt" is "entered by a court," a requirement that is satisfied here. Following the *Ozkok* rule in the context of deferred adjudication, Congress also determined that a conviction occurs upon an admission or finding of guilt and the imposition of "some form of punishment, penalty, or restraint on the alien's liberty." *Id.* However, Congress eliminated

---

[5] In stating that the respondent's conviction should not be viewed as final, the dissent relies in part on *Jimenez v. Quarterman*, 129 S. Ct. 681, 686 (2009), where the Supreme Court determined that a Federal habeas corpus petitioner whose appeal was reinstated out of time through a State collateral attack, before he had first sought habeas relief, did not receive a final judgment until the conclusion of the direct appeal. However, in general, habeas corpus law is not analogous to immigration law. *See Matter of Aguilar-Aquino*, 24 I&N Dec. 747, 752-53 (BIA 2009) (finding that the definition of "custody" in habeas corpus proceedings does not govern immigration proceedings). First, the purpose of Federal habeas corpus proceedings is to provide convicted defendants an avenue to collaterally attack the validity of their convictions. S*ee, e.g.*, *Sawyer v. Smith*, 497 U.S. 227, 234 (1990). However, aliens may not contest the facts or merits of their convictions in immigration proceedings. *Matter of C-*, 20 I&N Dec. 529, 532 (BIA 1992); *Matter of McNaughton*, 16 I&N Dec. 569, 571 (BIA 1978). In addition, under Federal habeas corpus law, a conviction is final only after direct discretionary review is complete. *Jimenez v. Quarterman*, *supra*, at 684-86. By contrast, the potential for discretionary review on direct appeal does not disturb the finality of a conviction for immigration purposes. *See Matter of Polanco*, *supra*, at 896. Moreover, the Supreme Court in *Jimenez* applied "the most natural reading of the statutory text" of the Federal habeas statute. *Jimenez v. Quarterman*, *supra*, at 685. In this case, the language of section 101(a)(48)(A) of the Act clearly supports our conclusion regarding the finality of late-reinstated appeals for immigration purposes.

the additional part of the *Ozkok* rule that exempted criminal aliens with a deferred adjudication from the immigration consequences of a conviction if they retained a right to pursue further proceedings to contest their guilt at an unknown time in the future. In so doing, Congress reflected its concern about the problems presented by the indeterminate nature of such proceedings and clearly expressed its disfavor with aliens' pursuit of avenues available under State laws to allow them to delay indefinitely the conclusion of immigration proceedings.

Even before Congress created a definition for the term "conviction" in the IIRIRA, there existed a "long-standing rule" that whether a conviction exists for immigration purposes "is a question of federal law and should not depend on the vagaries of state law." *Matter of Ozkok*, *supra*, at 549, 551 n.6 (citing *Matter of A-F-*, 8 I&N Dec. 429, 446 (BIA, A.G. 1959)). Some of the problems arising from the various ameliorative procedures available under State law were implicit in *Matter of Polanco*, *supra*, which involved a New Jersey late-reinstated appeal procedure similar to that at issue in this case. The New Jersey court rules required that a request to file a nunc pro tunc appeal be made in a timely manner, although without a specific outside time limit. Furthermore, the criminal court's determination whether to grant a request to file a late-reinstated appeal was "discretionary in nature" and therefore went beyond simply deciding if it was deemed to have been filed in a timely manner. *Id.* at 897. Thus, the procedure involved an unpredictable and indeterminate delay in immigration proceedings with no reasonable expectation that the alien would ultimately be granted relief from the conviction.

The concerns present in *Matter of Polanco* regarding the finality of a conviction subject to a late appeal process also exist in the New York procedure in this case. Section 460.10(1)(a) of New York Criminal Procedure Law provides for a direct appeal as of right within 30 days of a criminal conviction. However, if a defendant fails to meet this deadline, a motion may be filed within 1 year from the unmet deadline to present evidence showing that certain enumerated factors resulted in the defendant's failure to appeal. *Id.* §§ 460.30(1)-(2); *see also People v. Corso*, 40 N.Y.2d 578 (1976). Thus, a defendant may file a motion requesting permission to file a late-reinstated appeal more than a year after he is convicted, provided that he also demonstrates "due diligence" in filing the motion. *Id.* § 460.30(1). If the State opposes the motion, the appellate court must determine if a hearing is required and, if so, remand the matter to the trial court to conduct the hearing. *Id.* §§ 460.30(2)-(5). Furthermore, the decision on the motion itself may be appealed under certain circumstances. *Id.* § 460.30(6). Thus, while New York law does have an eventual deadline for making a *request* to file a late appeal, the statute permits motions to file an appeal to be made over a year after the

criminal conviction, and the *resolution* of such motions has no time limit. Ultimately, if the appellate court grants the motion, a defendant may be provided an additional 30 days to actually file the late-reinstated appeal. *Id.* § 460.30(1).

This New York procedure introduces a layer of uncertainty and delay far beyond that of a traditional appeal. This is, in part, a result of the long deadline for filing a motion and the unlimited nature of its resolution, but also because the procedure provides for a potentially extensive fact-based and judgment-laden inquiry. For example, the State court must determine the reason for the delay in filing a motion and whether the defendant acted with "due diligence" in filing it.[6] *Id.* § 460.30(1). The court could also be required to resolve whether a public servant or a defendant's attorney engaged in "improper conduct." *Id.* Thus, the late-reinstated appeal procedure under New York law is very different from the typical direct appeal as of right, which imposes prompt filing deadlines and requires only a ministerial act in accepting a notice of appeal.

Concerns regarding uncertainty in removal proceedings are amplified in the context of a motion to reopen, which is a disfavored process that imposes a heavy burden on the moving party to show that reopening is warranted. *See INS v. Doherty*, 502 U.S. 314, 323 (1992); *INS v. Abudu*, 485 U.S. 94, 107, 111 (1988). Finality and predictability are important principles in the law, including in immigration law. *See INS v. Abudu*, *supra*, at 107 ("There is a strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases.").[7]

In this case, removal proceedings were initiated, the Immigration Judge held a hearing, and the respondent was ordered removed, all before he even filed his motion for a late-reinstated appeal in State court. He then sought to reopen his removal proceedings based on a claim that his conviction is no longer final. The respondent was permitted to reinstate the time to appeal his conviction under a special State procedure that creates significant uncertainty and delay in reaching an ultimate resolution regarding the existence of an otherwise final

---

[6] We note that the respondent's motion to file a late appeal was contested by the State because of the length of the delay in filing the motion and the lack of adequate proof to support it.

[7] These interests are especially prevalent in a case such as this, where the respondent waited until after he was ordered removed before even attempting to challenge the basis for his removal order and has provided no explanation for this delay. *Cf. Matter of Cerna*, 20 I&N Dec. 399, 403 (BIA 1991) (noting that "we are not favorably disposed to the practice of waiting until the conclusion of the administrative appeal process to file a motion that seeks to offer additional evidence regarding the matter previously in issue").

conviction. Congress intended to prevent the immigration laws from being "dependent on the vagaries of State law" when it defined the term "conviction" in section 101(a)(48)(A) of the Act. Under these circumstances, we find that the respondent's pending late-reinstated appeal does not undermine the finality of his conviction for purposes of the immigration laws and conclude that it is therefore not appropriate to reopen and terminate these proceedings.[8]

## III. CONCLUSION

Given the indeterminate nature of the New York late appeal procedure and Congress's clear intent to give broad effect to the definition of a conviction in the deferred adjudication context, we find that the respondent's conviction remains a valid factual predicate for the charge of removability. We therefore conclude the Immigration Judge properly denied the motion to reopen. Accordingly, the respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.

*CONCURRING OPINION*: Edward R. Grant, Board Member

I respectfully concur.

I join in the well-reasoned decision of the majority. While it may not be absolutely necessary in this case to address the underlying question whether the "finality" requirement is still applicable and binding in removal proceedings, I would nevertheless do so. For the reasons cogently stated in the dissent, I would find that the "finality" requirement does still apply to cases where a direct appeal is pending or direct appeal rights have not been exhausted.

Fortunately, it appears that both the Department of Homeland Security and Immigration Judges continue to follow this rule. Even in those circuits where the court of appeals has indicated that the finality rule is no longer binding, it is a sound exercise of prosecutorial discretion, and in keeping with the goal of uniform administration of the immigration laws, to refrain from initiating

---

[8] A pending collateral attack also does not disturb the finality of a conviction and therefore would not justify reopening of removal proceedings. *See Matter of Adetiba*, 20 I&N Dec. 506, 508 (BIA 1992). If the respondent's conviction is ultimately vacated, however, he would be able to seek reopening to the same extent as an alien with a vacated conviction resulting from a successful collateral attack. *See Matter of Rodriguez-Ruiz*, 22 I&N Dec. 1378, 1380 (BIA 2000); *cf. Saleh v. Gonzales*, 495 F.3d 17, 24-25 (2d Cir. 2007).

removal proceedings based on a criminal conviction until any right of direct appeal from that conviction has been exhausted or waived.

For the reasons stated in the majority, this is just such a case. Removal proceedings were held in abeyance until well after the statutory period for direct appeal had expired. Those proceedings continued and resulted in the entry of an order of removal. It was only then that the respondent chose to take advantage of the unique "late-filed" appeal procedure available under New York law. Just as the initiation of removal proceedings prior to exhaustion or expiration of direct appeal rights would undermine the uniform enforcement of immigration laws, allowing an alien to forestall such proceedings, once properly begun, by filing a "late" appeal would impede the administration of justice.

Exceptions to this ruling may apply if the alien were to present compelling evidence of the likelihood of success on his late-filed criminal appeal. In such circumstances, sound judgment would dictate that proceedings before the Immigration Judge or this Board be held in abeyance until resolution of the appeal. But no such showing has been made in this case.

*CONCURRING OPINION*: Roger A. Pauley, Board Member, in which Patricia A. Cole, Board Member, joined

Although I join the majority opinion insofar as it addresses the finality issue in the narrow context of statutes that permit the late reinstatement of a direct appeal of a conviction, I write separately to respond to the dissenting opinion insofar as it contends that finality still generally exists as a requirement for a "conviction" for immigration purposes, notwithstanding the plain language of section 101(a)(48) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(48)(A) (2006), an assertion not gainsaid (and indeed arguably supported in dicta) by the majority opinion. As explained herein, the dissenting opinion is incorrect for many reasons.

I.

To begin with, the rationale of the dissent is incompatible with Supreme Court authority. *Demarest v. Manspeaker*, 498 U.S. 184 (1991). To comprehend why, imagine that no agency such as the Board ever existed and that Congress were now creating the definition of a "conviction" in section 101(a)(48)(A) of the Act for the first time. It is undisputed that the definition nowhere expressly embodies the requirement that, in immigration proceedings, a conviction must have been affirmed on direct appeal or that the time for taking a direct appeal must have expired in order for it to be deemed a "conviction." Ordinarily, and in the hypothetical circumstances described

above, were Congress to enact such plain language which lacks a "finality" requirement, I do not understand the dissenting opinion to deny that the text would command obedience. I believe it does so here as well. The dissent, however, purports to find contextual ambiguity in the otherwise clear and complete definition provided by Congress,[1] permitting those joining that opinion to deem the finality concept implicitly preserved, arising from the Board's long-standing previous understanding that a "conviction" for immigration purposes must have attained finality in the sense of having been affirmed on direct appeal, or the waiver of, or elapsing of the time to take, such an appeal having occurred. *See Matter of Ozkok*, 19 I&N Dec. 546, 552 n.7 (BIA 1988).

Unsurprisingly, no case law supports this novel proposition. To the contrary, as noted above, it is squarely at odds with *Demarest v. Manspeaker*, *supra*. Therein, the Court noted that the court of appeals below had "relied on long-standing administrative construction of the statute denying attendance fees to prisoners, and two Court of Appeals decisions to the same effect, followed by congressional revision of the statute in 1978." *Id.* at 190 (footnote omitted). The Court, however, unanimously rejected the administrative and judicial construction placed upon the statute, finding that the language of the statute was clear and did not lead to absurd or bizarre results, and that "administrative interpretation of a statute contrary to language as plain as we find here is not entitled to deference." *Id.* The situation in *Demarest v. Manspeaker* is directly analogous, save only that there the agency's past interpretation of a term was supported by holdings of two appellate courts,

---

[1] The dissent does not contend that the definition is incomplete, apart from its alleged failure to incorporate the concept of finality. The only apparent basis to do so is that the definition fails to state that a reversed conviction is not covered. Compare *Matter of Pickering*, 23 I&N Dec. 621 (BIA 2003), where the Board noted that one court of appeals found the text of section 101(a)(48)(A) so clear as to compel a finding that even a conviction reversed on the merits remained a "conviction" for immigration purposes. However, the Board declined to adopt this interpretation, deeming it to be contrary to our precedent. *Id.* at 624 n.2; *see also Lewis v. United States*, 445 U.S. 55, 61 n.5 (1980) (rejecting as "extreme" the argument that a reversed conviction remained a conviction for purposes of the statute punishing possession of a firearm by a convicted felon, but noting that the statute would apply where, as here, possession occurred while a conviction was pending on appeal). A well-recognized (indeed the sole) exception to the axiom that plain language in a statute must be followed is that doing so would lead to absurd or bizarre results. *E.g.*, *Demarest v. Manspeaker*, *supra*. Thus, Congress is not obliged to negate absurd or bizarre consequences that flow from a literal application of the language it enacts, and accordingly its definition of a "conviction" in section 101(a)(48)(A) is not incomplete for its omission to provide that reversed convictions are not within its scope.

which is not the case here.  Thus, *Demarest v. Manspeaker* alone is a refutation of the dissent's analysis.[2]

Both the dissenting and the majority opinions invoke *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520 (1998).  But that case is not analogous.  Even assuming no distinction for statutory construction purposes between prior Supreme Court decisions and administrative agency interpretations, in terms of the respect deemed to be accorded them by Congress, the Court in *Alaska v. Native Village* pegged its decision to the fact that the legislative history of the statute at issue reflected that it was intended by Congress to codify the Supreme Court's own prior decisions.  *Id*. at 530.  In contrast, all the dissent can muster by way of legislative history is congressional silence.  This is insufficient.

Moreover, *Alaska v. Native Village* construed a statute where Congress adopted the *entirety* of the definition contained in the Supreme Court's prior decisions defining Indian country.  Here, by contrast, Congress did not adopt in whole the Board's prior understanding of the term "conviction."  To the contrary, it adopted only a portion thereof and indeed embodied as an express (and executed in language) purpose to *eliminate* any requirement, previously embodied in the Board's prior practice and understanding, pertaining to finality in the deferred adjudication context.  To infer from this a purpose of Congress to *retain* the principle of finality elsewhere in the definition, wholly unsupported by any legislative language or history, is simply to make an illogical leap.  Thus, absent any wholesale adoption in the text of the definition enacted as section 101(a)(48) of the Board's previous understanding regarding the necessity that a conviction have attained "finality," or even any legislative history reflecting an intent to preserve the principle of finality for types of convictions other than deferred adjudications, reliance on *Alaska v. Native Village* is unavailing.

In addition and significantly, Congress elected to define a "conviction" very precisely, using the limiting term "means" instead of allowing for a broader administrative or judicial interpretation by using the enlarging term "includes" to communicate nonexclusivity.  As the Supreme Court has recognized, a "'definition which declares what a term "means" . . .

---

[2] Although Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that preexisting interpretation when it *reenacts* a statute without change, *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), that case and others like it are inapposite because we are not dealing with a reenactment of a statute by Congress.  Rather, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, embodied an unequivocal break with the prior judicial and administrative requirement of finality of convictions in immigration proceedings in that it included, for the first time, a statutory definition of the term "conviction" under the Act.

excludes any meaning that is not stated.'" *Colautti v. Franklin*, 439 U.S. 379, 392 n.10 (1979) (quoting 2A C. Sands, *Statutes and Statutory Construction* § 47.07 (4th ed. Supp. 1978)); *see also Burgess v. United States*, 128 S. Ct. 1572, 1578 n.3 (2008).

Furthermore, the dissenting opinion's unwarranted creation of a new exception to the plain language rule would tend to undermine the separation of powers and confer upon the Board (and by extension all administrative agencies charged with the interpretation of the statute or statutes they administer) a power to influence the content of legislation derived from its prior practice and understanding of a term, notwithstanding that Congress has undertaken for the first time to define it and has nowhere incorporated that understanding or practice in its definition. For Congress to be found to have rejected the Board's understanding that finality is a component of a conviction, the dissent concludes, it is insufficient for Congress merely to fail to include any reference to finality in its language. Silence in an otherwise complete definition is not enough. The dissent's remarkable position is that Congress, partially constrained by the Board's prior understanding of a "conviction," must have acted *affirmatively in statutory language* to repudiate it, before they will acknowledge that it has been superseded.[3] The dissent's measured prose cannot disguise the radical nature of its thesis, one that siphons lawmaking authority from Congress and vests it in administrative agencies such as the Board.

In sum and in essence, the dissenting opinion falls into fundamental error in exalting the legislative history, consisting merely of an absence of expression of intent to discard or alter the Board's previous understanding that a conviction requires finality, over the plain statutory language employed by Congress that does just that in that it contains no such finality element. While silence may in some circumstances be a useful clue in criminal investigations, *see, e.g.*, Sir Arthur Conan Doyle, *Silver Blaze*, *in The Memoirs of Sherlock Holmes* (1892) (regarding the case of the dog that didn't bark), it is not a reliable indicator of congressional purpose in the face of otherwise plain language. Indeed, the point of plain language is that it requires no explanation. *See Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 623 (D.C. Cir. 1989) (noting the waggish doctrine that it is only where the statutory history is ambiguous that a court will look to the words of the statute).

---

[3] Thus, in its conclusion, the dissenting opinion asserts that "[a]bsent clear statutory language to the contrary," it would find that the "rule of finality in immigration law continues to apply." *Matter of Cardenas Abreu*, 24 I&N Dec. 795, 823 (BIA 2009).

## II.

The regulations also support the conclusion that the definition of the term "conviction" in section 101(a)(48) of the Act, enacted in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), lacks a finality element. The regulations contain no provision, applicable to removal proceedings under section 240 of the Act, 8 U.S.C. § 1229a (2006), generally, that treats the term "conviction" as defined in the Act. This fact further supports the notion that the statutory language is clear and complete on its face and requires no elaboration.

However, tellingly, in implementing the provisions of the Act dealing with the expedited removal of nonlawful permanent resident aliens convicted of one or more aggravated felonies, the Attorney General, in 1997 shortly after the enactment of the IIRIRA, promulgated regulations that address section 238 of the Act, 8 U.S.C. § 1228 (2006). The regulations provide in pertinent part that for an alien to be subject to expedited removal, the alien must have "been convicted (as defined in section 101(a)(48) of the Act . . .) of an aggravated felony and such conviction has become final." 8 C.F.R. § 1238.1(b)(iii) (2008). If the definition of a "conviction" enacted by the IIRIRA bore the understanding, as the dissent contends, that a conviction must have attained finality, it would have been unnecessary for the regulation to specify that the conviction must have become final. It is true that the regulation carried forward a finality of conviction requirement in the regulations implementing a similar provision in the Act prior to the IIRIRA. *See* 8 C.F.R. § 242.25(b)(iii) (1996). The fact remains, however, that the current regulation, issued hard on the heels of the IIRIRA's enactment of a definition of the term "conviction" for the first time, coupled with the absence of any like regulation specifying a finality principle applicable to removal proceedings generally, is consistent with the clear language of the statute and reflects an understanding that that definition itself embodies no finality requirement. A regulation is to be construed like a statute, and it is a basic rule of construction, albeit not woodenly applied, not to deem language therein to be superfluous. *See, e.g.*, *Ali v. Federal Bureau of Prisons*, 128 S. Ct. 831, 840 (2008); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).

## III.

Also as a matter of concern, the dissent's position would place the Board in opposition to the holdings of three courts of appeals that the concept of finality did not survive the enactment of the definition of a "conviction" in section 101(a)(48)(A) of the Act. It would also be in conflict with the considered dicta

to the same effect of two additional circuits, including the one in which this case arises.[4] The dissent's attempt to depreciate the force of the decisions from the United States Courts of Appeals for the Fifth, Seventh, and Tenth Circuits, whose holdings are based on the plain language of the statute and are not subject to being supplanted through the doctrine of deference afforded to agency interpretations of ambiguous provisions,[5] is misplaced.[6] Moreover, for its part, the dissent can point to no holding or even considered dicta of a court of appeals in support of its analysis or result.[7] Likewise, the dissent's, and to some extent the majority's, reliance on or noting of the fact that Congress explicitly retained the requirement of finality in a few selected provisions of the Act, at best, does not aid the case that finality in a more general sense was preserved. Indeed, that circumstance may well cut the other way. *See Clay v. United States*, 537 U.S. 522, 528-29 (2003) (reiterating the maxim that "[w]hen 'Congress includes particular language in one section of a statute but omits it in another section of the same Act . . . it is generally presumed that

---

[4] *Puello v . Bureau of Citizenship and Immigration Servs.*, 511 F.3d 324, 332 (2d Cir. 2007) ("IIRIRA did, however, eliminate the requirement that all direct appeals be exhausted or waived before a conviction is considered final under the statute.").

[5] *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005).

[6] *Garcia-Maldonado v. Gonzales*, 491 F.3d 284 (5th Cir. 2007); *United States v. Saenz-Gomez*, 472 F.3d 791 (10th Cir. 2007); *Montenegro v. Ashcroft*, 355 F.3d 1035 (7th Cir. 2004). I disagree with the dissent that these decisions should be discounted simply because they did not arise in the immigration context. To the contrary, a statutory provision that applies in multiple contexts must be interpreted consistently in all contexts. *See Clark v. Martinez*, 543 U.S. 371, 380 (2005) (noting that even when "constitutional concerns . . . are not present for aliens . . . who have not been admitted to the United States . . . it cannot justify giving the *same* detention provision a different meaning when such aliens are involved"); *see also Leocal v. Ashcroft*, 543 U.S. 1, 11-12 n.8 (2004). Moreover, the dissent is mistaken in treating the above-cited decisions from the Fifth and Seventh circuits as nonholdings. *See Matter of Cardenas Abreu*, *supra*, at 819. A reading of the decisions belies this assertion. In both cases, the court *decided* the finality issue, even though another basis (not relied on) for reaching the result existed.

[7] The dissent's statement that the "Third and Sixth Circuits have found finality to be preserved," *Matter of Cardenas Abreu*, *supra*, at 819, is a gross exaggeration, as in neither case was the statement more than dicta uttered in passing. Moreover, neither decision discussed or even cited the definition in section 101(a)(48) of the Act, in contrast to the considered dicta in *Puello v. Bureau of Citizenship and Immigration Servs.*, *supra*. In addition, the dissent's analogy to selected criminal recidivism provisions in which Congress elected to require finality of prior convictions does not demonstrate a generally accepted finality requirement because, as in section 101(a)(48)(A) of the Act, Congress has elected *not* to include such a requirement in many other provisions in the criminal context that relate to prior offenses or convictions. *See, e.g.*, 18 U.S.C. §§ 228(c), 924(c), 1029(c), 1030(c), 2241(c), 2251(e), 2252(b) (2006).

Congress acts intentionally and purposely in the disparate inclusion or exclusion'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).

IV.

Likewise, even the underlying premise of the dissenting opinion—that a prior practice of the Board existed to require finality, which Congress purportedly carried forward implicitly—is not borne out in this case. As the majority opinion persuasively explains, while such a prior understanding existed generally, *see Matter of Ozkok*, *supra*, no such prior practice or understanding existed in the instant circumstances where the conviction originally attained finality because the time to appeal expired, but the alien's right to appeal was restored due to a State procedure allowing, in certain cases, for the recognition of a late appeal. Such a procedure has many of the trappings of a collateral challenge to a conviction such that, at best from the perspective of the dissent, prior to the IIRIRA's enactment of the definition of a "conviction," it was debatable whether, even though the defendant's motion once granted restores a defendant's full direct appeal rights, the conviction should be deemed to have attained finality.[8] In what appears to be the only instance in which the Board, in a published decision, addressed the finality question in this context, we expressly *declined* to decide it. *Matter of Polanco*, 20 I&N Dec. 894, 898 (BIA 1994) (expressly reserving the question of "what effect proof of a pending nunc pro tunc appeal might have on the finality of [a] conviction."). Absent a single prior Board precedent, much less a long-standing practice addressing this situation, the dissent's reliance on the contextual ambiguity of the otherwise plain language of the definition of a conviction enacted in 1996, arising from the Board's allegedly long-standing contrary understanding, falls by the wayside.

V.

Last, I wish to note that I have no quarrel from a policy perspective with the concept of finality as previously applied by the Board. It is within a range

---

[8] For example, in a State that has no procedure for a late reinstatement of appeal, if a defendant were to succeed in a habeas corpus challenge based on an ineffective assistance of counsel claim predicated on the failure of counsel to file an appeal as requested, the remedy, as with the late reinstatement statute in this case, would be to allow the defendant to take an appeal. But there is no pre-IIRIRA Board practice or precedent of which I am aware to support the notion that such a conviction lacks finality for immigration purposes, such that Congress should be deemed through incorporation of our practice or case law to have embodied such a result in section 101(a)(48) of the Act.

of reasonable policy choices available to Congress and serves to assure that an alien found removable on the basis of a conviction, who has a direct appeal of that conviction pending, may not be removed.  On the other hand, that the elimination of finality, as three courts of appeals have rightly concluded was accomplished by section 101(a)(48)(A) of the Act, likewise is not unreasonable.  *See supra* note 6.  There is no constitutional right to an appeal of a conviction, and, indeed, for many years in our nation's history no such opportunity was provided.  *See Abney v. United States*, 431 U.S. 651, 656 (1977).  Moreover, even today a defendant may be compelled to serve in full his or her sentence despite the pendency of a direct appeal.  *See, e.g.*, 18 U.S.C. § 3143(b)(1) (2006).  Congress could also consider that only a small fraction of criminal appeals by defendants is successful, and that applying "finality" as the Board had understood it prevents the Department of Homeland Security ("DHS") from instituting removal proceedings against, and taking into custody, aliens whom it regards as dangerous and who are at large pending appeal of their convictions.[9]  Thus, strong policy considerations also support eliminating the finality requirement.[10]  But the point is that the policy is not ours to make, but that of Congress, and Congress has clearly made its decision through the plain language it adopted in section 101(a)(48)(A), which contains no finality requirement.

## VI.  CONCLUSION

As demonstrated above, the position of the dissenting opinion is unsupportable on a number of fronts.  While it would reach an outcome that

---

[9] Moreover, Congress could factor in that even if DHS opted to bring removal proceedings based on an alien's conviction in all situations where direct appeal was pending, it is unlikely that a great change would ensue in terms of the removal of aliens with such pending appeals. The time in which removal proceedings before Immigration Judges could be scheduled would ensure that many appeals would be decided before those proceedings concluded. When to such an interval is added the time for resolution of an alien's appeal of right to the Board, during which no alien may be removed, 8 C.F.R. § 1003.6 (2008), the percentage of aliens with direct appeals remaining would be small indeed.  Additionally, nothing compels the DHS to physically remove an alien who has been ordered removed while a direct appeal of a conviction bearing on removability remains unresolved.

[10] I note that myriad other policy choices are available, apart from the all or nothing ones of either requiring finality or not in every circumstance.  For example, Congress might reasonably opt to require finality for removability determinations, but not for purposes of bars to eligibility for relief based on a conviction.  Congress could also, if it deemed public safety considerations to so warrant, require finality only for convictions involving nonviolent crimes, or it could designate particular offenses or types of offenses, such as those involving national security or sexual misconduct, as not requiring finality.

some may applaud, and that Congress is free to adopt, it would bestow on the Board a power it does not possess and would effectively legislate by adding to, rather than interpreting, the definition of the term "conviction" in the Act. Because I agree with the outcome and reasoning of the majority opinion as it pertains to finality in the limited situation, as here, of a late-reinstated appeal, and profoundly disagree with the position of the dissent that would find finality in all contexts to have been preserved without a shred of support therefor in the statutory language, I respectfully concur.[11]

*DISSENTING OPINION*: Anne J. Greer, Board Member, in which David L. Neal, Vice Chairman; Neil P. Miller, Frederick D. Hess, Charles K. Adkins-Blanch, and Linda S. Wendtland, Board Members, joined

The respondent seeks termination of proceedings because the criminal conviction underlying the charge of deportation is pending on direct appeal. I agree with the respondent that his conviction must still be "final" under the statutory definition for a conviction at section 101(a)(48)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(48)(A) (2006), an issue which the majority declines to reach. Unlike the majority, I conclude that the pendency of a direct appeal pursuant to section 460.30 of the New York Criminal Procedure Law means that the respondent's conviction is not final for immigration purposes.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent, a native and citizen of the Dominican Republic, entered the United States as a lawful permanent resident on or about June 26, 1996. On or about October 11, 2007, the respondent was convicted of burglary in the first degree in violation of section 140.30 of the New York Penal Law. As a result, he was charged as deportable pursuant to section 237(a)(2)(A)(iii) of the Act, 8 U.S.C. § 1227(a)(2)(A)(iii) (2006), as having been convicted of an aggravated felony under section 101(a)(43)(G) of the Act. In removal proceedings, the Immigration Judge annotated the Notice to Appear to indicate that the respondent admitted these factual allegations

---

[11] Should further review by the Attorney General take place, *see* 8 C.F.R. §§ 1003.1(g), (h) (2008), I note that if the respondent's conviction were to be affirmed in the interim, this would not moot the case because of the doctrine of "capable of repetition yet evading review." *E.g.*, *Honig v. Doe*, 484 U.S. 305, 318-23 (1988). Moreover, the Board and the Attorney General are not constrained by the "case or controversy" requirements of Article III of the Constitution. *See Matter of Luis*, 22 I&N Dec. 747, 753 (BIA 1999).

and, as to the conviction, had taken "no appeal yet."  On July 22, 2008, the Immigration Judge ordered the respondent removed from the United States to the Dominican Republic.  On October 14, 2008, the respondent filed a timely motion to reopen proceedings, presenting evidence that his criminal conviction was pending on direct appeal pursuant to a September 26, 2008, grant of his motion for an extension of time to appeal under section 460.30 of New York Criminal Procedure Law.  The facts are not disputed, including that the respondent's criminal conviction is now pending on direct appeal as of right.

## II.  ISSUES

The first issue presented is whether a criminal conviction underlying a charge of deportability or inadmissibility is required to attain finality under the statutory definition of a conviction at section 101(a)(48)(A) of the Act, enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA").  If finality is required, the issue remains whether the respondent's pending late-filed appeal constitutes a direct appeal of his criminal conviction.

## III.  WHETHER FINALITY IS REQUIRED

Prior to the 1996 addition of a definition for the term "conviction" in the Act, the prevailing standard to evaluate whether a conviction existed for immigration purposes was set forth by this Board in *Matter of Ozkok*, 19 I&N Dec. 546 (BIA 1988).  Neither the *Ozkok* definition nor the statutory definition explicitly addresses finality, although the Board explained in *Ozkok* that a criminal conviction continued to require finality in order to sustain a charge of deportation.  *Id.* at 552 n.7.  In enacting the IIRIRA, Congress chose language to define a conviction in terms that mirror key portions of the Board's definition in *Ozkok*.  The deliberate use of parallel language reinforces the long-held administrative and judicial requirement of "finality" that was incorporated in *Ozkok*.  The source of the language enacted is needed to ascertain the plain meaning of this statutory definition, which is silent regarding finality.  Significantly, in the Board's other precedent decisions examining the plain meaning of section 101(a)(48)(A) of the Act, we considered the relevant context in the absence of specific statutory language speaking to the issue at hand.  That same approach applies here.

### A. History of Finality in the Immigration Context

Under *Matter of Ozkok*, *supra*, a State deferred adjudication that provided for a contingent right to contest guilt did not equate to a conviction, whereas State deferred adjudications that did not afford this contingency qualified.[1] According to *Ozkok*, a conviction exists for immigration purposes where an alien has had a formal judgment of guilt entered by a court or, if adjudication of guilt has been withheld, where all of the following elements are present: (1) a judge or jury has found the alien guilty or he has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilty, (2) the judge has ordered some form of punishment, penalty, or restraint on the person's liberty to be imposed, and (3) a judgment or adjudication of guilt may be entered if the person violates the terms of his probation or fails to comply with the requirements of the court's order, without availability of further proceedings regarding his guilt or innocence of the original charge.[2] This definition of a conviction was widely upheld by Federal circuit courts of appeals.[3]

In addition to being required to meet the *Ozkok* criteria, an alien's criminal conviction did not support a finding of deportability until it became final. Indeed, *Ozkok* specifically explained that the definition of a conviction continued to incorporate the well-settled doctrine of finality. In particular, the Board clarified that "[i]t is well established that a conviction does not attain a sufficient degree of finality for immigration purposes until direct appellate

---

[1] *See, e.g.*, *Martinez-Montoya v. INS*, 904 F.2d 1018 (5th Cir. 1990) (holding that the Texas deferred adjudication procedure, which provided for further proceedings on the issue of guilt before entering judgment, did not constitute a conviction for immigration purposes), *superseded by statute as stated in Moosa v. INS*, 171 F.3d 994 (5th Cir. 1999); *cf. Yanez-Popp v. U.S. INS*, 998 F.2d 231 (4th Cir. 1993) (finding that a grant of "probation without judgment" under Maryland law, during which time the court had the power to enter a judgment or adjudication of guilt without further proceedings upon a violation of probation, met the *Ozkok* standard for conviction).

[2] The statutory definition of a conviction at section 101(a)(48)(A) of the Act provides:

> The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—
> (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
> (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

[3] *See, e.g.*, *Wilson v. INS*, 43 F.3d 211 (5th Cir. 1995); *Yanez-Popp v. INS*, *supra*; *Molina v. INS*, 981 F.2d 14 (1st Cir. 1992); *Chong v. INS*, 890 F.2d 284 (11th Cir. 1989).

review of the conviction has been exhausted or waived." *Id*. at 552 n.7 (citing *Marino v. INS*, 537 F.2d 686 (2d Cir. 1976); *Aguilera-Enriquez v. INS*, 516 F.2d 565, 570 (6th Cir. 1975); *Will v. INS*, 447 F.2d 529 (7th Cir. 1971)). *Ozkok* and the circuit court cases it cites regarding finality look to the United States Supreme Court's decision in *Pino v. Landon*, 349 U.S. 901 (1955) (per curiam), *rev'g Pino v. Nicolls*, 215 F.2d 237 (1st Cir. 1954). The Supreme Court reversed the decision of the lower court by stating: "On the record here we are unable to say that the conviction has attained such finality as to support an order of deportation within the contemplation of [former section] 241 of the Immigration and Nationality Act." *Id.*

Historically, a conviction attained finality for immigration purposes when the alien had either waived or exhausted his direct appeal rights. *See, e.g.*, *Aguilera-Enriquez v. INS*, *supra*. During the pendency of an alien's direct appeal of a criminal conviction, the former Immigration and Naturalization Service accordingly did not commence deportation proceedings. If deportation proceedings were initiated on the basis of a criminal conviction under direct appellate review, the Immigration Judge had a legal basis to terminate the proceedings. The line of cases following *Ozkok* prior to the IIRIRA's enactment continued to recognize that a conviction must attain a reasonable degree of certainty through waiver or exhaustion of direct appeals of right to serve as a basis for a charge of deportation under the Act. *See, e.g.*, *Wilson v. INS*, 43 F.3d 211 (5th Cir. 1995) (discussing finality in the context of waiver or exhaustion of a direct appeal); *cf. Matter of Onyido*, 22 I&N Dec. 552, 555 (BIA 1999) (explaining that the respondent had a final conviction after the enactment of the IIRIRA where he entered a guilty plea from which there was no right of direct appeal).

In the IIRIRA, Congress defined a conviction as "a formal judgment of guilt of the alien entered by a court." Section 101(a)(48)(A) of the Act. Where adjudication of guilt is deferred, Congress enacted most of the *Ozkok* test to determine whether a conviction exists. Given that Congress chose to adopt *Ozkok*, except for its third prong addressing a specific category of deferred adjudications, I conclude that Congress was aware of and accepted the decisions of the Supreme Court, the United States courts of appeals, and this Board underlying and affirming *Ozkok*, with regard to finality. Congress's adoption of existing language used in an established Board precedent is akin to reenacting a portion of an existing statute while intending to preserve its attendant administrative and judicial interpretations. *See generally Lindahl v. Office of Personnel Mgmt.*, 470 U.S. 768, 782 n.15 (1985) ("'So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.'" (quoting *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978))).

Here Congress effectively enacted language from a Board precedent decision defining a conviction, while clearly omitting one of the Board's three requirements in the deferred adjudication context. In these circumstances, it can be presumed that Congress was aware of, and intended to preserve, the administrative and judicial interpretations attendant to the portions of the Board precedent it enacted, particularly given the importance of the finality doctrine in the immigration context.

This view is consistent with the Supreme Court's analysis in *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520 (1998). In *Alaska v. Native Village*, the Court held that the term "dependent Indian communities," as used in a statute defining "Indian country," was to be interpreted consistently with judicial precedents issued prior to the statute's enactment. *Id.* at 528-31. These precedents required a Federal Government set-aside for use as Indian land, together with Federal superintendence. While the statute did not explicitly mention those well-established requirements, the Court observed that the statute's text derived directly from judicial precedent and found that the statute did not alter the existing definition established by case law. Likewise, Congress took the pertinent text of section 101(a)(48)(A) of the Act verbatim from *Matter of Ozkok*, *supra*, and did not purport to alter the recognition in *Ozkok* and other precedents of a finality requirement for convictions serving as the factual predicate for deportability or inadmissibility. *See also Staples v. United States*, 511 U.S. 600, 605 (1994) (observing that the Court must construe a statute in light of the background rules of common law, in which the requirement of some mens rea for a crime is firmly embedded); *cf. Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991) (observing that "[t]here is no indication that Congress was aware of the administrative construction, or of the appellate decisions, at the time it revised the statute").

## B. Board Interpretation of Section 101(a)(48)

The statutory language enacted by Congress to define a "conviction" is silent as to the significance of both post-conviction ameliorative actions and finality. Both must be addressed by the Board in interpreting this statute.[4] *See generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005). We have issued a series of precedent decisions addressing the effect of State post-conviction actions on a conviction

---

[4] *See, e.g.*, *Alim v. Gonzales*, 446 F.3d 1239, 1249 (11th Cir. 2006) ("As we read § 1101(a)(48)(A), Congress did not address the effect to be given a conviction or nolo contondere [sic] plea that is subsequently vacated because of a defect in the underlying criminal proceeding.").

under section 101(a)(48)(A) of the Act.  In these decisions, we looked beyond the statute's plain words and considered relevant context in construing the statute, which approach applies here.

In our first decision addressing the meaning of the new definition set forth in the IIRIRA, we relied on the statutory language but also examined the legislative history, which explained congressional intent to eliminate the third prong of *Ozkok* to avoid inconsistent outcomes for deferred adjudications. *Matter of Punu*, 22 I&N Dec. 224, 227 (BIA 1998) (citing H.R. Rep. No. 104-828, at 224 (1996) (Conf. Rep.), 1996 WL 563320)).  In *Punu*, we identified Congress's intent as set forth in the legislative history to "make it easier to remove criminal aliens, regardless of specific procedures in States *for deferred adjudication*."  *Id.* (quoting H.R. Rep. No. 104-879 (1997), 1997 WL 9288 at *295) (emphasis added).  Accordingly, we found it to be "clear that Congress deliberately modified the definition of conviction *to include deferred adjudications*."  *Id*. (emphasis added).  Next, in *Matter of Roldan*, 22 I&N Dec. 512 (BIA 1999), we recognized that the plain language of the new statutory definition did not address the effect of State post-conviction actions on a conviction for immigration purposes, requiring us to "'look to the particular statutory language at issue, as well as the language and design of the statute as a whole.'"  *Id.* at 521 (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)).

In employing this contextual approach, we concluded in *Roldan* that certain vacated or expunged convictions continue to serve as valid factual predicates for a charge of deportation, despite a lack of express language to that effect in section 101(a)(48)(A) of the Act.  Then, in *Matter of Rodriguez-Ruiz*, 22 I&N Dec. 1378 (BIA 2000), and *Matter of Pickering*, 23 I&N Dec. 621 (BIA 2003), we concluded that convictions vacated on the basis of a procedural or legal defect in the underlying criminal proceedings do not remain convictions for immigration purposes.[5]  Our statutory interpretation of the conviction definition regarding post-conviction modification has been well received by

---

[5]   As discussed, our *Roldan/Rodriguez-Ruiz/Pickering* approach relied on analysis beyond the plain words contained in section 101(a)(48)(A) of the Act.  Similarly, in *Matter of Eslamizar*, 23 I&N Dec. 684, 686, 688 (BIA 2004), we looked beyond the "literal reading of the conviction definition" to examine congressional intent to leave "the normal and traditional meaning of a judgment" intact.

the circuit courts,[6] with the exception of the United States Court of Appeals for the Fifth Circuit.[7]

Here, as with finality, section 101(a)(48)(A) of the Act does not specifically speak to the effect of post-conviction actions addressed at altering the underlying conviction. While the statute could be read to eliminate the effect of all post-conviction measures, including substantive vacaturs, as stated by the Eleventh Circuit, such an approach would be "so foreign, so antithetical, to the long-standing principles underlying our criminal justice system and our notions of due process that we would expect Congress to have spoken very clearly if it intended to effect such results." *Alim v. Gonzales*, 446 F.3d 1239, 1249 (11th Cir. 2006) (citing *United States v. Sanges*, 144 U.S. 310, 322 (1892)).[8]

As we said in *Roldan*, "Congress has approved the federal approach taken in *Ozkok*, but has gone even further than *Ozkok* by eliminating the one prong of our former definition which required an examination of how a specific state structured its rehabilitative statute." *Matter of Roldan*, *supra*, at 522. In my view, Congress approved the *Ozkok* Federal approach that incorporated finality, rather than eliminating the requirement through silence on the subject. *See generally Cannon v. Univ. of Chicago*, 441 U.S. 677, 698-99 (1979) (finding the legal context at the time of a statute's enactment relevant in evaluating congressional action and stating that it was "not only appropriate but also realistic to presume that Congress was thoroughly familiar with . . . important precedents from . . . federal courts and that it expected its

---

[6] *See, e.g.*, *Alim v. Gonzales*, *supra*; *Pinho v. Gonzales*, 432 F.3d 193 (3d Cir. 2005); *Cruz-Garza v. Ashcroft*, 396 F.3d 1125 (10th Cir. 2005); *Ali v. Ashcroft*, 395 F.3d 722 (7th Cir. 2005); *Ikenokwalu-White v. INS*, 316 F.3d 798 (8th Cir. 2003).

[7] *See Renteria-Gonzalez v. INS*, 322 F.3d 804, 812 (5th Cir. 2002) (finding a conviction to remain a valid basis for removal despite being vacated or expunged for other than immigration purposes); *cf. Discipio v. Ashcroft*, 417 F.3d 448 (5th Cir. 2005) (observing that no other circuit disagrees with *Pickering*, but declining to revisit the panel decision in *Renteria-Gonzalez* absent en banc intervention), *vacating* 369 F.3d 472 (5th Cir. 2004).

[8] If an alien's criminal conviction were ultimately overturned on direct appeal, the conviction would no longer support a charge of removability. Removal of the individual pending direct appellate review would lead to serious consequences should the conviction be reversed. *See, e.g.*, *Staples v. United States*, *supra*, at 616 (observing that a potentially harsh penalty supports reading the statute to encompass a traditional mens rea requirement not included in statutory language). If the conviction is ultimately overturned after removal has occurred, the respondent cannot seek reopening of the removal proceedings. *Matter of Armendarez*, 24 I&N Dec. 646 (BIA 2008) (construing 8 C.F.R. § 1003.2(d) (2008) to mean that the Board and immigration courts lack jurisdiction to reopen the proceedings of aliens who have been removed). Consequently, the majority opinion's observation regarding the potential availability of a motion to reopen after a conviction has actually been vacated does not assist an alien who already has been removed.

enactment to be interpreted in conformity with them"); *see also Zuni Public Schools Dist. No. 89 v. Dep't of Educ.*, 127 S. Ct. 1534, 1545-46 (2007) (noting that the "'[m]eaning—*or ambiguity*—of certain words or phrases may only become evident when placed in context'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000))).

The concurrence of Board Member Pauley disavows any intention to treat convictions subjected to substantive vacaturs as giving rise to removability, and it endeavors to justify its different approach in that context by pointing to the maxim that permits deviating from plain statutory language when its literal application would lead to absurd results. Notably, however, the Eleventh Circuit did not employ such a rationale when it held that convictions that are vacated for underlying defects become invalid for immigration purposes in *Alim v. Gonzales*, *supra*. Rather, the court concluded that section 101(a)(48)(A) "*does not specify*" how to treat such convictions, but instead "defines a conviction up through the time of sentence," while "*say[ing] nothing* about what effect, if any, the conviction or plea should be given when there is a subsequent vacatur because the alien's statutory or constitutional rights were violated during the underlying criminal proceeding." *Id.* at 1248 (emphasis added). The court thus found "statutory silence," rather than relying on plain language, and turned to addressing the reasonableness of the Board's construction of the statute. *Id*. at 1249.[9]

### C.  Circuit Court Consideration of Finality Under Section 101(a)(48)(A)

Six circuit courts of appeals, including the Second Circuit, have addressed finality under section 101(a)(48)(A) of the Act with differing results. None of the decisions of these courts examines the issue as it is presented here, i.e., during the pendency of a direct appeal of the conviction supporting removal. *See, e.g.*, *Alim v. Gonzales*, *supra*, at 1248 (explaining that precedent dealing with the ongoing validity of convictions set aside for State rehabilitative purposes did not address, and therefore did not govern, the situation presented). The Second Circuit has observed in dicta that the IIRIRA

---

[9] In *Staples v. United States*, *supra*, the Court determined that the "substantial body of precedent" on the question whether Congress intended to dispense with a conventional mens rea element provided so helpful an interpretive tool that it was not even necessary to rely on the rule of lenity, under which an ambiguous criminal statute is to be construed in favor of the accused. *Id*. at 619 n.17; *see also INS v. St. Cyr*, 533 U.S. 289, 320 (2001); *INS v. Errico*, 385 U.S. 214, 225 (1966) ("'[S]ince the stakes are considerable for the individual [charged with deportation], we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used.'" (quoting *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948))).

eliminated the requirement for finality under section 101(a)(48)(A). *Puello v. Bureau of Citizenship and Immigration Servs.*, 511 F.3d 324, 332 (2d Cir. 2007). *Puello* did not involve a challenge based on an appeal of a conviction. The alien in *Puello* had pled guilty and was challenging the effective date of the conviction for purposes of his naturalization application. The Fifth Circuit in *Garcia-Maldonado v. Gonzales*, 491 F.3d 284, 290-91 (5th Cir. 2007), also noted in dicta that finality is no longer required. However, the court clarified that no "appeal [was] actually pending for [the alien's] . . . conviction." *Id.* at 290; *see also Moosa v. INS*, 171 F.3d 994 (5th Cir. 1999) (addressing deferred adjudication rather than a direct appeal of a criminal conviction). Moreover, in *Garcia-Maldonado*, the court relied chiefly on its prior holding in *Renteria-Gonzalez v. INS*, *supra*, that even a conviction that has actually been vacated for substantive legal defects would remain valid for immigration purposes.

The Third and Sixth Circuits have found finality to be preserved. In *United States v. Garcia-Echaverria*, 374 F.3d 440, 445 (6th Cir. 2004), the court stated that "[t]o support an order of deportation, a conviction must be final" in terms of exhaustion of direct appeal rights. In *Garcia-Echaverria*, which is a criminal illegal reentry case, the court held that the alien's conviction was final for immigration purposes. The court found that the appeals at issue were "collateral attacks upon Garcia-Echaverria's conviction," filed after the time expiration of the direct appeal deadline, and concluded that his "conviction was final for removal purposes." *Id.* at 446. Most recently, in *Paredes v. Attorney General of U.S.*, 528 F.3d 196, 198 (3d Cir. 2008), the court, quoting the now superseded *Ozkok* as controlling without discussing the statutory conviction definition, observed that "'[a] conviction does not attain a sufficient degree of finality for immigration purposes until direct appellate review of the conviction has been exhausted or waived.'"

While the Tenth Circuit has held that finality is no longer required in *United States v. Saenz-Gomez*, 472 F.3d 791, 794 (10th Cir. 2007), which arose in the sentence enhancement context, I observe that at the time of the court's decision, the alien's criminal appeals had already been dismissed by the New Mexico Court of Appeals and the New Mexico Supreme Court. *Id.* at 792. Recognizing that the court held that a conviction already existed for immigration purposes at the time of the alien's removal from the United States, prior to defense counsel's filing of his direct criminal appeal, I respectfully disagree with that aspect of the holding. In *Montenegro v. Ashcroft*, 355 F.3d 1035, 1037 (7th Cir. 2004), the Seventh Circuit's consideration of finality was also moot because the alien's direct appeals had been exhausted at the time of the Immigration Judge's decision, and the United States Supreme Court denied his petition for certiorari almost 5 years before the Seventh Circuit's decision. *See Montenegro v. Illinois*, 525 U.S. 1158 (1999) (denying certiorari).

In *Griffiths v. INS*, 243 F.3d 45, 53 n.3 (1st Cir. 2001), the court highlighted the distinction between a deferred adjudication and a direct appeal for purposes of finality. In *Griffiths*, the First Circuit reserved the question whether finality remains intact, agreeing with the Board that the alien had been the subject of a deferred adjudication, which does constitute a conviction under the section 101(a)(48)(A) statutory definition. Significantly, in *Griffiths*, the court observed that "[t]here are substantial practical differences between the situation faced by a defendant currently exercising a direct appellate right and that faced by a defendant with a theoretically available right to appeal." *Id.* at 54.[10]

Thus, the circuit court decisions—both those that find the requirement of finality retained and those that find it superseded—offer conflicting statements in circumstances different from the instant case that heighten the Board's responsibility to interpret the Act. *See generally Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, *supra* (holding that a court's prior judicial construction of a statute prevails over an agency construction that is otherwise entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, *supra*, only if the prior court decision holds that the construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion).

### D. Finality Preserved Elsewhere in the Act

If Congress had intended to remove the finality requirement under the Act, it presumably would have done so uniformly throughout the Act, rather than leaving finality intact in other provisions without apparent justification. *See, e.g.*, sections 237(a)(2)(D), 238(c)(3)(A)(iii), 241(a)(4)(B) of the Act, 8 U.S.C. §§ 1227(a)(2)(D), 1228(c)(3)(A)(iii), 1231(a)(4)(B) (2006). We find reading finality out of the Act in this manner to be impermissible because it fails to

---

[10] *Griffiths* involves the same "on file" procedure at issue in *Pino v. Landon*, *supra*, that "'suspend[ed] the adjudicative process, including the defendant's right to appeal, until such time as the court reactivates or makes some further disposition of the case.'" *Griffiths v. INS*, *supra*, at 51 (quoting *White v. INS*, 17 F.3d 475, 479 (1st Cir. 1994)). *Pino* did not provide a rationale for concluding that the Massachusetts "on file" procedure failed to meet the finality requirement and did not set forth a finality standard. As discussed, extensive case law came to consensus in defining finality for immigration purposes, culminating in the *Ozkok* standard. Under the third prong in *Ozkok*, the *Pino/Griffiths* "on file" procedure would not equate to a conviction because it constitutes a deferred adjudication that could allow for further proceedings on guilt or innocence in the future. Today, under the section 101(a)(48)(A) statutory definition, an attenuated possibility of obtaining appellate review for a deferred adjudication has been specifically defined as not detracting from the finality of a conviction for immigration purposes. *Matter of Punu*, *supra*.

"interpret the statute 'as a symmetrical and coherent regulatory scheme' . . . and 'fit, if possible, all parts into an harmonious whole.'" *FDA v. Brown & Williamson Tobacco Corp.*, *supra*, at 133 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995), and *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959)). [11]

## IV. WHETHER A PENDING APPEAL UNDER SECTION 460.30 OF THE NEW YORK CRIMINAL PROCEDURE LAW IS A FINAL CONVICTION

Direct appeals for purposes of finality are interpreted to mean direct appeals of right, not including the potential for discretionary review on direct appeal. For example, the Board held in *Matter of Polanco*, 20 I&N Dec. 894 (BIA 1994), that an alien who did not exercise his direct appeal of right under New Jersey law had a final conviction, despite the potential for seeking a discretionary nunc pro tunc appeal. Of significance to the Board in *Polanco* were the indeterminate time available to file the appeal and the appeal's discretionary nature. The majority and concurring opinions maintain that because we left open the question whether the authorization of a discretionary nunc pro tunc appeal would render a conviction not final for immigration purposes in *Matter of Polanco*, *supra*, there is no history of administrative applications of the finality rule in the "late appeal" context. This position overlooks our conclusion in *Polanco* that the kind of "late appeal" at issue was like a collateral attack, rather than a direct appeal, because the pertinent State law set forth no deadline for seeking authorization to file the late appeal, and the decision whether to authorize the appeal was largely discretionary. *Cf. Jimenez v. Quarterman*, 129 S. Ct. 681 (2009) (finding that for purposes of triggering the limitations period for Federal habeas review, the date of the conviction's finality was the date of conclusion of the direct appeal that the State court had granted a right to file out of time).

I must respectfully disagree with the majority opinion's characterization of New York's procedure for obtaining a nunc pro tunc extension of the time for taking a direct criminal appeal as creating too much "uncertainty and delay"

---

[11]  The Pauley concurrence argues that the regulatory requirement at 8 C.F.R. § 1238.1(b)(1)(iii) (2008) that convictions be final to support an order of expedited removal supports reading section 101(a)(48)(A) as not including finality. However, the regulation contained the exact same finality requirement prior to enactment of section 101(a)(48)(A). 8 C.F.R. § 242.25(b)(1)(iii) (1996). Further, regulatory emphasis on finality in the expedited removal context, where removal occurs quickly without proceedings before an Immigration Judge, does not undermine its vitality in adversarial removal proceedings.

to affect a conviction's finality for immigration purposes. *Matter of Cardenas Abreu*, 24 I&N Dec. 795, 801 (BIA 2009). Section 460.30(1) of the New York Criminal Procedure Law provides for a late appeal under only very limited circumstances, requiring the defendant to demonstrate that his failure to file an appeal during the normal time period resulted from either (a) "improper conduct of a public servant or improper conduct, death or disability of the defendant's attorney," or (b) "inability of the defendant and his attorney to have communicated, in person or by mail, concerning whether an appeal should be taken, prior to the expiration of the time within which to take an appeal[,] due to [the] defendant's incarceration in an institution and through no lack of due diligence or fault of the attorney or defendant." Further, the defendant must exercise due diligence in filing his extension motion, and in any case must do so not more than 1 year after the normal appeal period's expiration. *Id.* Although the court may order further fact-finding if necessary, the extension motion "must" ultimately be granted if a legal basis for it is ultimately demonstrated. *Id.* §§ 460.30(3)-(5).

This procedure is a far cry from the New Jersey procedure that was involved in *Matter of Polanco, supra*. In that case we found it "significant" that there were "no time constraints whatsoever to limit the period" during which permission to take a nunc pro tunc appeal could be sought. *Id.* at 897. We also relied heavily on New Jersey's treatment of such motions as "discretionary in nature." *Id.* Although the majority opinion observes that New York's implementation of its procedure for determining whether its mandatory late-appeal criteria have, in fact, been satisfied can potentially result in time delays of indeterminate length, the same could be said of the process for adjudication of criminal appeals generally. But Congress has never determined that such timing considerations outweigh the importance of ensuring that a conviction has attained a sufficient degree of finality before it can give rise to a removal order.

Moreover, the fact that New York in this instance has actually authorized a late criminal appeal necessarily means that it has determined that the respondent has, in fact, demonstrated, after exercising due diligence, that his failure to file a timely appeal resulted from improper conduct by a public servant or by the respondent's criminal defense attorney, the death or disability of that attorney, or an inability of the respondent and his attorney to communicate in a timely manner about a potential criminal appeal because of his incarceration, and through no fault of his own. If New York wishes to authorize extensions of time for filing direct criminal appeals under these kinds of circumstances, I do not believe that it is the province of this Board to effectively determine for immigration purposes that such appeals are not legitimately "direct" after all. Indeed, for purposes of removal proceedings, this Board, the Attorney General, or Congress has determined that the same

kinds of circumstances can warrant tolling or (in at least one circumstance) negation of an otherwise applicable deadline. *See Matter of Compean, Bangaly & J-E-C-*, 24 I&N Dec. 710 (A.G. 2009) (holding that, in the exercise of discretion, the Board may toll the deadline for filing a motion to reopen where the alien demonstrates, and exercises due diligence in discovering, deficient performance of counsel); section 240(b)(5)(C)(ii) of the Act, 8 U.S.C. § 1229a(b)(5)(C)(ii) (2006) (providing that a motion to reopen and rescind an in absentia order may be filed "at any time" if the alien demonstrates that he was in Federal or State custody at the time of his hearing, and that his failure to appear was through no fault of his own). Although the majority opinion would find it determinative that New York's procedure for extending criminal appeal deadlines nunc pro tunc is not equivalent to "the typical direct appeal as of right, which imposes prompt filing deadlines and requires only a ministerial act in accepting a notice of appeal," *Matter of Cardenas Abreu*, *supra*, at 801, I would not impose such inflexible conditions on direct appeals for the purpose of determining the finality of a conviction for immigration purposes, particularly when we have not done so in the context of setting deadlines for motions filed in removal proceedings.


## V. CONCLUSION

Absent clear statutory language to the contrary, I would find that the historically accepted rule of finality in immigration law continues to apply when a charge of removal requires a criminal conviction. In doing so, I recognize that the consequences of removal in some cases might very well be considered severe enough to ensure that a reasonable degree of finality has been attained in terms of exhaustion or waiver of direct appeals of right, essentially ensuring that no premature removal occurs. I do not believe that Congress's explicit concern over deferred adjudications, which by definition provide an opportunity for mitigation after the establishment of guilt, encompasses a challenge to guilt through the direct appeals process.[12]

In my view, the New York statute allowing for late-filed direct appeals preserves a respondent's direct appeal rights. As such, the conviction does not trigger civil removal consequences for an alien—if the late-filed appeal is accepted by the appellate court and until it is resolved. Accordingly, I would sustain the respondent's appeal and terminate removal proceedings.

---

[12] Deferred adjudication, also known as a "deferred judgment," is defined as a "judgment placing a convicted defendant on probation, the successful completion of which will prevent entry of the underlying judgment of conviction." *Black's Law Dictionary* 454, 859 (8th ed. 2004).